# CASES DETERMINED

AT THE

# January Term, 1907.

---

WISCONSIN SULPHITE FIBRE COMPANY, Respondent, vs.
D. K. JEFFRIS LUMBER COMPANY and another, Appellants.

*December 8, 1906—May 21, 1907.*

*Contracts: Modification: Statute of frauds: Consideration: Logs and
lumber: Agreement for manufacture: Settlement: Accounts: Errors: Fraud: Evidence: Separate books of account: Negligence
in performance: Absence of damage: Accounting: Allowance of
expenses: Actual cost: Losses: Burden of proof: Taxes: Logs,
etc., where assessable: Payment of joint liability: Costs: Dis-
bursements for copy of testimony.*

1. A written contract, if not of a character required by the statute
   of frauds to be in writing, may be modified or added to by sub-
   sequent parol agreement without any new consideration.
2. A court cannot make new agreements for parties nor ignore
   agreements deliberately made by them, in the absence of fraud
   or substantial mistake or impossibility of enforcement.
3. A contract for the manufacture and sale of logs provided that
   the owner should be paid from the proceeds "$5 per thousand,
   log measure." It was subsequently agreed that the log scale
   should be determined by deducting twenty-five per cent. from
   the actual scale or tally of "sound lumber" cut from the logs.
   *Held,* that the method so agreed upon was capable of being
   practically applied, the term "sound lumber," though not used
   by manufacturers to designate a grade of lumber, being shown
   to have been used by the parties with a definite meaning.
4. Under a contract by which defendant was to manufacture and
   sell plaintiff's logs and collect and account for the proceeds,
   paying plaintiff a certain sum per thousand feet and then, after

deducting actual cost of the work, dividing the balance of the proceeds with plaintiff, the entire business being intrusted to defendant, there was a necessary implication that the accounts necessarily kept by defendant in carrying out the contract should be the primary basis of settlement between the parties; and if the contract was properly carried out according to its terms and such accounts were correctly kept they would govern the settlement.

5. Errors in such accounts would be subject to correction in the settlement, but the accounts could not be wholly rejected and a different basis of settlement substituted, in the absence of fraud or bad faith, unless they were shown to be substantially inaccurate and untrustworthy.

6. The evidence in this case (stated in the opinion) is *held* not to show any fraudulent or surreptitious cutting and conversion of plaintiff's logs and not to show that the accounts kept by defendant are so substantially inaccurate and unreliable that they should be rejected as a basis for determining the amount of lumber actually cut from the logs and sold.

7. Under a contract for the manufacture and sale by defendant of plaintiff's logs, providing that the logs and the lumber made therefrom should be kept separate from defendant's logs and lumber, it was not necessary that defendant should open separate books for such stock or should sell it wholly by itself.

8. Failure of defendant to keep and present, as provided in the contract, vouchers for expenses incurred, and failure to make monthly statements and remittances and annual settlements as agreed, are immaterial where no damage resulted.

9. A finding by a referee that lumber manufactured under a contract was improperly trimmed and edged is *held* to be against the clear weight of the evidence.

10. It being provided in a contract for the manufacture and sale of lumber that defendant should be entitled to retain from the proceeds "the *actual cost* of removing, hauling, sawing, piling, planing, selling, loading, and disbursements for insurance," the reasonable or customary charge for such work cannot be the standard of allowance, nor can evidence thereof be material unless it is thereby made to appear that the amount charged as the actual cost is so excessive as to show bad faith or fraud.

11. Defendant had rendered to plaintiff a statement of the total expenses under the contract and afterwards in the verified answer alleged the amount of such expenses to be substantially the same, but at the trial defendant produced a statement increasing the amounts charged for planing, loading, and selling the lumber, explaining that the earlier statements were simply

estimates based on the prices usually charged for such work, while the last was the result of prorating the total sum actually paid for such work between plaintiff's lumber and defendant's own lumber handled during the same period. The answer was not amended. *Held*, that the last statement did not show actual cost but was still essentially an estimate, and that, on the evidence, the allowance to plaintiff for such work should be limited to the amount charged in the first statement.

12. As to a claim by defendant for losses in bad accounts on the sale of the lumber, the burden was on defendant to prove that the losses were actually incurred in the prudent conduct of the business.

13. Repairs to the mill or the machinery or tools therein cannot be considered any part of the expenses which were to be deducted from the proceeds of sales before settlement, since, under the contract, defendant was to furnish the mill in which to manufacture the lumber.

14. A tramway having been built in defendant's mill yard exclusively for hauling plaintiff's lumber and having been torn down as soon as it had served this purpose, the net difference between the value of the material used when new and its value when torn down, if shown, would be a proper expense charge; and so, also, as to machinery and material used in constructing loading works for plaintiff's logs. But in the absence of any showing as to the value of such materials or machinery a disallowance of charges therefor cannot be disturbed.

15. The contract having been made for the sawing, etc., of plaintiff's logs at defendant's mill for their joint benefit, the logs were thereafter properly assessable for taxation, under sec. 1040, Stats. (1898), in the town in which said mill was located.

16. Under such contract the parties, if not partners in the strict sense, were both principals in a joint enterprise, and if one paid a joint liability (such as taxes duly assessed upon the logs and lumber) he was entitled to credit therefor upon settlement.

17. Disbursements for a copy of the testimony, procured for convenience of an attorney in arguing a case before a referee, are not taxable as costs under secs. 2921, 2928, Stats. (1898). The words "documents or papers" in sec. 2928 do not cover a copy of the testimony.

APPEAL from a judgment of the circuit court for Outagamie county: JOHN GOODLAND, Circuit Judge. *Modified and affirmed.*

This is an action to recover a balance claimed to be due

upon a contract for the manufacture and sale by the defendant lumber company of a large quantity of lumber from logs belonging to the plaintiff. The contract was made in March, 1896. At that time the plaintiff owned between 4,000,000 and 5,000,000 feet of pine saw logs which had been cut during the previous winter, the most of which were banked in Trap Lake near Monico Junction and a small portion at a railroad siding two miles north of Monico. The plaintiff owned no sawmill, but the defendant lumber company owned and operated a mill at Jeffris, about twenty miles distant from Monico. The contract provided that the defendant lumber company should load all the logs above referred to on cars and take them to the mill at Jeffris and there saw them into lumber, shingles, lath, and lumber products to the best advantage of all parties, pile the same separately, plane the same as far as necessary to make advantageous sales, make sale thereof as far as possible to the best advantage from time to time, load and ship on cars and collect all moneys due on sales as far as possible with due diligence, insure the product for the use of the parties, and perform all the conditions in a workmanlike manner, using due diligence in collecting the money due on sales. It was further provided that plaintiff was to be paid out of the first proceeds received from sales "at the rate of $5 per 1,000, log measure, until the same shall be fully paid." After this payment the defendant lumber company was to retain from the proceeds of sales the actual cost of removing, hauling, sawing, piling, planing, selling, loading, and insuring, and the balance was to be divided equally between the two parties. The work of sawing was to begin July 15, 1896, and continue night and day. Monthly statements of sales were to be furnished and monthly remittances and annual settlements were to be made. The lumber company was to keep the logs and product free from liens and incumbrances, and to carry accident insurance so as to prevent

liability from accidents to employees, and the "logs and prod-
ucts" were to be kept separate. Other provisions relating to
the division of insurance moneys in case of fire are not ma-
terial here. The contract contained no provision stating how
the "log measure" on which the defendant was to pay the
plaintiff $5 per 1,000 feet should be determined.

Soon after the execution of the contract the defendant com-
pany transported the logs banked at the siding by rail to Jef-
fris, and dumped them in the mill pond or small lake at the
mill, and inclosed the same in a separate boom. These logs
made eighty-five carloads, averaging somewhere from 4,000
to 5,000 feet to the car. The lumber market was depressed
during the summer of 1896, and the parties concluded that
it would be best to postpone the manufacture of the lum-
ber to the following year, and the logs in the lake at Mon-
ico were left there until the spring of 1897. In August,
1896, however, an order was received by the defendant com-
pany for 8x8 timbers, and the defendant commenced the man-
ufacture of the same from the plaintiff's logs. The logs were
not scaled as they went into the mill, and there is a dispute
as to how many feet of logs were then manufactured, the
plaintiff claiming that more than 100,000 feet were sawed,
while the defendant claimed that not more than 40,000 to
50,000 feet were then sawed, and the referee found that the
amount did not exceed 100,000 feet. Of the amount so
cut, one carload, containing 11,648 feet, was immediately
shipped to fill the order for timber. According to the defend-
ant's testimony the balance then cut was piled separately in
the defendant's millyard. The defendant claims that soon
after this cutting an oral supplemental agreement was made
by which the scale of the logs on which the $5 per 1,000 was
to be paid was to be determined by deducting twenty-five per
cent. from the scale or tally of the No. 3 and better sound lum-
ber cut from the logs. This is denied by the plaintiff, and the

referee made no finding on the subject. It is admitted that the following written agreement was made May 6, 1897:

"It is further agreed that the *D. K. Jeffris Lumber Company* are to start sawing on *Wisconsin Sulphite Fibre Company's* logs not later than June 1, 1897, and that the log scale shall be determined by deducting twenty-five per cent. from the actual scale or tally of sound lumber cut from aforesaid logs."

In the spring of 1897 the boom inclosing the remainder of the siding logs in the millpond at Jeffris broke, and the greater portion of the logs escaped into the lake and mixed with the defendant's logs, all of which had been cut during the immediately preceding winter. Defendant claims that the plaintiff's logs were easily recognizable and were at once marked, and that the greater portion of them as they came to the mill were placed in a pocket by themselves. Plaintiff claims, however, that many, if not most, of them were manufactured into lumber indiscriminately with defendant's logs and went into the defendant's piles. Early in June, 1897, the defendant put in loading works at the lake at Monico, and took out the logs in the lake and transported them by rail to Jeffris. June 24, 1897, the defendant commenced sawing the plaintiff's logs, and sawed exclusively thereon until September 6th, when all had been sawed except a few deadheads subsequently picked up. During this time the plaintiff employed two men, Dennis and Tubbs, who scaled the logs on the log deck as they came into the mill, one working during the day and the other at night. Their scale aggregated 3,584,540 feet. The tally at the tail of the mill during this time showed a cut of 4,039,286 feet of lumber of all grades. The defendant's testimony tends to show that all of this lumber, together with the amount previously cut, was piled in a separate place and marked with an "M." The defendant company had a large amount of its own lumber in the yard. It did a large wholesale business. There were

no cash or retail sales.   All the lumber sold went out by
cars.   When orders were received they were filled from de-
fendant's piles and plaintiff's piles, as was most convenient,
and in a large majority of the cases there was lumber from
both stocks.   The defendant's employees were instructed to
keep the Monico stock shipped in separate items marked "M"
on their tally cards as they made shipments, and testified that
they did so.   These tally cards were turned in at the office and
the bookkeepers were instructed to keep account of the Mon-
ico stock sold and shipped, and it appears that they attempted
to do so.   The defendant's mill was burned in December,
1897, and soon after this the books of account were moved
to Janesville, where they were afterwards kept.

   The defendant claimed that under the supplemental agree-
ment the amount of logs on which it should pay $5 per
1,000 was to be determined by deducting twenty-five per cent.
from the total amount of sound lumber No. 3 and better tal-
lied into cars according to the books from the Monico stock,
and adding thereto a small remnant left unsold in the yard in
November, 1899, viz., 39,184 feet, which was inventoried by
the parties at that time and sold to the defendant; that the
total amount of all grades as so ascertained is 4,060,646 feet,
of which 3,374,805 feet was sound lumber No. 3 and better,
three fourths of which amount is 2,476,224 feet, which at
$5 per 1,000 amounts to $12,381.12 to be paid for the logs.
The defendant also claimed that the total amount received on
sales of lumber was $44,443.25, and that, deducting from this
the $12,381.12 to be paid for logs, there was left a balance of
$32,062.13 as the proceeds of sales on joint account.   The de-
fendant claimed to have paid $11,800 on the log account,
leaving $581.12 due thereon.   It also claimed that the ex-
pense account aggregated $28,577.69, leaving a balance on
the joint account of $3,484.44, one half of which belonged to
the plaintiff, viz., $1,742.22, making a total on log and joint
account of $2,323.34, to which should be added certain other

items, resulting in a total balance due plaintiff January 1, 1902, of $2,751.80.

The plaintiff claimed by its original complaint that the amount due on the log account and the joint account over and above payments and expenses was $43,500, and upon the trial an amendment to the complaint was allowed by which a claim for damages in the sum of $25,000 for failing to use diligence in removing the logs and for negligent and unworkmanlike manufacture was added.

The action was referred to a referee for trial. The referee found by his twentieth finding that the original agreement for the manufacture of the lumber was made by the parties, and that it was supplemented by the agreement of May 6, 1897, both of which have been previously stated. In this connection he further found

"that there was no consideration paid by defendant to procure the execution or the modification of the contract, and it was not the intention of the parties in executing said modification to rely upon the sound lumber scale; that there is no such grade known among manufacturers of lumber as *sound lumber;* that under all the agreements made between the parties the plaintiff is entitled to $5 per 1,000 feet upon the actual scale of the logs after deducting twenty-five per cent. from said actual scale. The actual scale of lumber of No. 3 and better cannot be determined, owing to the imperfect manner of keeping tally and keeping the books of the defendant."

The referee then finds that the total amount of logs which were manufactured must be determined by taking the Dennis and Tubbs scale, viz., 3,583,540 feet, adding thereto ten per cent. for overrun, adding to this the siding logs, viz., 385,740 feet, and ten per cent. for overrun, and deducting from the total twenty-five per cent. in accordance with the modified agreement, by which process he obtains a total of 3,274,657 feet, which at $5 per 1,000 amounts to $16,372.28, which should be paid for the logs under the modified agreement.

By his twenty-second finding the referee found that

4,039,274 feet of lumber of all grades was cut from the logs scaled by Dennis and Tubbs from June 24 to September 6, 1897; that this did not include any of the siding logs; that the siding logs aggregated 385,740 feet, to which should be added ten per cent. for the overrun in No. 3 and better and eight per cent. for overrun in culls, thus making a total cut of lumber, exclusive of shingles and lath, of 4,494,447 feet; that the record kept by defendant of the amount of Monico lumber sold and shipped is not reliable, and to determine the amount by tracing the shipments through defendant's books is impracticable; that the defendant claims that the whole amount of lumber sold is 4,052,598 feet, whereas in fact it was 4,494,459 feet, making 441,861 feet not accounted for, which was reasonably worth $10 per 1,000 feet, making $4,418.61 which should be credited to the joint account.

By his seventh and eighth findings the referee found that the logs cut in 1897 were properly slabbed, and that the lumber was piled as well as circumstances would permit; that proper care was not taken in trimming and edging the same, and consequently considerable of the lumber was graded as No. 4 which by proper trimming would have made No. 3 and better, but that the damage thereby is unascertainable; that considerable sound timber was manufactured into shingles which should have been made into lumber; and that from these causes it is impossible to say how much No. 3 and better lumber was cut from the Monico stock.

By his twenty-eighth and twenty-ninth findings the referee found that the defendant had failed to cut the logs into lumber and other products to the best advantage of the parties; that it failed to perform the work in a workmanlike manner; that it failed to keep and present vouchers for the loading expenses, failed to keep correct accounts of receipts and disbursements, and failed to make monthly statements of sales and monthly remittances and annual settlements as agreed; that it failed to keep the products separate, but intermixed

them with its own stock in shipping; that it failed to make a correct scale or tally of the lumber manufactured; that the plaintiff has not waived any of the conditions or terms of the contract, except that as to the time when the defendant should commence the moving and sawing of the logs. No damages are found to have resulted from these defaults.

By other findings the referee disallowed numerous items of expenses claimed by the defendant which will be fully discussed in the opinion. The referee found in conclusion that the plaintiff was entitled to judgment for $13,648.18, with interest, said sum being made up as follows:

| | |
|---|---:|
| Balance due on logs | $5,709 23 |
| One half of joint account over and above expenses | 7,512 43 |
| Credits for omissions | 426 52 |
| Total | $13,648 18 |

The referee's report was confirmed by the court and judgment rendered thereon, from which the defendant appeals.

*John Barnes,* attorney, and *M. G. Jeffris,* of counsel, for the appellants.

For the respondent there was a brief by *Charles Barber* and *Henry D. Ryan,* and oral argument by *Mr. Barber.*

The following opinion was filed March 19, 1907:

WINSLOW, J.   It is evident that there are two important questions at the very foundation of this case, upon the correct solution of which the case must largely depend, namely: (1) The question how the quantity of logs upon which the defendant is to pay $5 per 1,000 is to be determined; and (2) the question how the amount of lumber actually manufactured and sold is to be determined.

The original agreement made no express provision as to the method of determining these questions. It is, however, quite certain that the first of these questions became a subject of earnest consideration between the parties in the summer of 1896. This is conclusively shown by a letter produced by

the defendant on the trial which was written by Mr. Reese, the plaintiff's business manager, to the defendant August 5, 1896, and delivered to *Mr. Jeffris,* defendant's manager, by the hand of Mr. Burton, apparently on the following day. Mr. Burton was an employee of the plaintiff who was present in its behalf at the defendant's mill while the sawing of plaintiff's logs was going on both in the summer of 1896 and the summer of 1897. This letter is addressed to the defendant and reads in part as follows:

"Our Mr. Burton is here and reported how matters turned out on the small lot of logs you have sawed. He also reports that there is a question as to how the logs are to be scaled, either before or after they are sawed. We will leave the matter in the hands of our Mr. Burton, and whatever terms or condition you agree upon will be satisfactory to us."

Mr. Reese at first denied having given Burton any such authority, but, when shown the letter, admitted that he wrote it. Burton at first denied having made any arrangement or having had any negotiations concerning the matter with *Jeffris;* but, after the letter was produced and *Jeffris* had testified to its receipt and to having made an arrangement with him concerning the matter, Burton gave no further testimony on the subject. *Jeffris* testified positively that he received the letter August 6, 1896, and that he then agreed with Burton that the log scale should be determined by deducting twenty-five per cent. from the No. 3 and better sound lumber tally, and that on the same day he made a pencil memorandum of the agreement at the foot of the letter. This memorandum still appears on the letter. The referee made no finding on the subject, and so the fact, if material, must be determined on the weight of the evidence alone, and we have no hesitation in holding that the evidence clearly shows that the agreement claimed by *Jeffris* was made.

The original contract was not of a character required by the statute of frauds to be in writing, hence it might be modi-

fied or added to by subsequent parol agreement of the parties. Nor need the modification rest on any new consideration: the original consideration is imported into the modification. *Brown v. Everhard,* 52 Wis. 205, 8 N. W. 725; *Montgomery v. Am. Cent. Ins. Co.* 108 Wis. 146, 84 N. W. 175. But, even if there were doubt about the making of the oral modification, it is conceded by both parties that a written modification was duly made May 6, 1897, when only a small portion of the logs had been sawed, which provided that "the log scale should be determined by deducting twenty-five per cent. from the actual scale or tally of sound lumber cut." Of course it was perfectly competent for the parties to agree upon a method of ascertaining the log measure, and if the agreement is definite in its terms and the evidence shows that the method can be practically applied, it must be applied. The court cannot make new agreements for the parties nor ignore agreements deliberately made, in the absence of fraud or substantial mistake or impossibility of enforcement.

The referee's conclusions upon this subject contained in his twentieth finding of fact are somewhat peculiar. After finding the execution of a preliminary memorandum agreement by the parties March 4, 1896, briefly stating the outlines of the arrangement and the subsequent execution of the formal detailed agreement on which the action is based, and the fact that in neither of said agreements was it specified how the log scale was to be determined, the referee finds that the supplemental agreement of May 6th was executed, but that (1) there was no consideration paid by defendant for its execution, (2) that it was not the intention of the parties in executing the same to rely upon the sound lumber scale, and (3) there is no such grade known among manufacturers as "sound lumber." If these propositions have any relevancy to the controversy at all, it must be because they are supposed in some way to nullify or change the effect of the modifying agreement; but we are unable to see how they can have that

result.   As we have already seen, no new consideration was necessary to make the modifying agreement effective, so the lack of consideration is immaterial.   The parties have deliberately and unambiguously said that the log scale should be determined by the actual scale of sound lumber cut from the logs, so a finding that they did not intend to rely upon such scale is contrary to the evidence.   While it may be true that the term "sound lumber" is not used by manufacturers to designate a grade of lumber, still it clearly appears that it is an apt term used in the lumber business with a well known and understood meaning.   There was testimony by *Mr. Jeffris* and other witnesses, which we have not found contradicted, that the term as applied to boards means a board free from rot or knot holes or a bad shake; that a No. 3 board is not necessarily sound lumber, but anything under No. 3 does not come under the designation of sound lumber.   Now, the parties who used the term both had experience in the business.   They doubtless used the term advisedly and with a definite meaning.   It is the business of the court to find the meaning and carry it into effect, if the evidence is sufficient for the purpose.   When we consider the fact that an oral arrangement was made in 1896 by which the term was plainly used as meaning No. 3 and better, the further fact that the formal agreement of May, 1897, was apparently intended simply to put the previous oral arrangement in written form, and when we also consider the evidence as to the ordinary meaning of the term "sound lumber," we can entertain no doubt that it must be construed as meaning all grades above No. 4.   Thus the referee's third proposition becomes also immaterial, and we reach the conclusion that the supplemental agreement of May 6, 1897, was a valid agreement, and provides the rule by which the log measure is to be determined.

As to the method of determining the amount of the lumber actually manufactured and sold, there can be little or no doubt that the parties contemplated that the defendant should

through its employees keep an accurate account thereof, and that this account was to be the primary basis of settlement. The plaintiff turned over to the defendant its logs in bulk. Most careful and elaborate provision was made for the proper handling, sawing, piling, planing, shipping, selling, and insuring of the product and for the collection of the moneys due on sales and accounting for such moneys to the plaintiff, but all this was to be done by the defendant and its employees. Not an act of any kind was required of the plaintiff save to turn over the logs. After this was done the entire business was absolutely intrusted to the defendant, which was necessarily obliged to scale the lumber and keep correct accounts of the expenses and receipts of sales in order to carry out its contract. The accounts thus kept would by necessary implication be the primary basis of settlement as fully as though the parties had so provided in express words. If the contract was carried out in good faith and with reasonable diligence according to its terms and the accounts were correctly kept, they would necessarily govern the settlement. If errors were committed in them, such errors were, of course, subject to correction; but the accounts could not be rejected *in toto* and a different method of determination and settlement substituted, unless fraud or bad faith was shown or substantial mistakes of such a character as to affect to considerable degree the rights of the plaintiff and stamp the supposed accounts as untrustworthy in substance. Trifling or comparatively immaterial error in computing amounts or in transcribing from one book to another would not have that effect. *Stubbings v. McGregor,* 86 Wis. 248, 56 N. W. 641. The defendant claimed upon the trial that it had carried out the contract in good faith. It brought its books and papers into court and presented its account drawn therefrom. It proved the careful directions given to its employees with regard to keeping the Monico logs and lumber separate from its own lumber and keeping separate accounts of the sale and ship-

ment thereof. It brought its employees into court to testify as to the manner in which such directions were carried out, and it unquestionably made a *prima facie* showing of an execution of the contract in good faith according to its terms and the keeping of an honest and fairly accurate account.

The referee, however, rejected the account, and held that the log measure must be determined by taking the Dennis and Tubbs scale of the logs sawed from June to September, 1897, adding thereto ten per cent. for overrun, and adding to this total Burton's scale of the siding logs with ten per cent. overrun in No. 3 and better, and thus obtained a grand total of 4,366,208 feet as the correct log scale, from which he deducted twenty-five per cent. in order to arrive at the number of feet upon which $5 per 1,000 was to be paid. Just why the twenty-five per cent. should have been deducted, in view of the conclusions of the referee as to the ineffective character of the agreement of modification, does not very clearly appear. Nor does it appear whether the ten per cent. overrun on the logs sawed from June to September, 1897, includes the whole cut or only No. 3 and better. As to the siding logs, the ten per cent. overrun is expressly said to include only No. 3 and better, and, as these logs were confessedly of poorer quality than the Trap Lake logs, it would seem to be a natural conclusion that the overrun in the latter logs must be an overrun in No. 3 and better. But, however this may be, it is certain that the finding must rest upon the fact that none of the siding logs were sawed during the June to September sawing of 1897, but that all the logs then manufactured were Trap Lake logs. Proceeding from this basis to find the lumber which was in fact cut from the plaintiff's logs, the referee takes the tally at the tail of the mill during the June to September, 1897, sawing, amounting to 4,039,286 feet, including mill culls, and adds thereto the Burton scale of the siding logs with ten per cent. overrun, making 424,314 feet; and also a further eight per cent. overrun of mill culls on the latter logs,

and makes a grand total of 4,494,459 feet of lumber actually cut, which exceeds the amount accounted for by defendant by 441,861 feet. He then credits the joint account $10 per 1,000 for this excess, making an additional credit of $4,418.61. Here again the only basis on which the finding can rest is the fact that only Trap Lake logs were cut during the June to September sawing of 1897. These findings can only be justified on the ground that the defendant surreptitiously and intentionally converted nearly half a million feet of plaintiff's lumber to its own use, or on the other ground that its accounts contained such serious and substantial omissions as to render them entirely unreliable and call for their rejection from consideration. The deliberate appropriation of nearly half a million feet of lumber, even in a transaction of this magnitude, would be no easy undertaking. Had it been actually done or attempted, there would infallibly be traces of the malfeasance left here and there which would have come to light during an exhaustive trial, whose record fills a printed volume of more than 500 pages. We have found no such indications, and indeed we do not understand that any intentional appropriation of lumber is claimed by the plaintiff. We proceed then to the consideration of the question whether the accounts kept by the defendant are so substantially inaccurate and unreliable that they must be rejected as a basis for determining the lumber actually cut from the logs. Upon this question a more detailed statement of the evidence *pro* and *con* becomes necessary.

The testimony of *Mr. Jeffris* was clear and undisputed to the effect that he gave careful instructions to his employees before the sawing of the Monico logs was begun that the lumber manufactured therefrom must be marked and piled separately in the yard, and that when sold and shipped a separate tally should be carefully kept, returned to the office, and entered on the books as Monico stock. Not only is this testimony undisputed, but it is intrinsically probable, and is fully

corroborated by all of the defendant's employees who were
placed upon the stand. Mr. Harwick, who was defendant's
bookkeeper during the years 1897 and 1898, a fair and intelli-
gent witness used by both parties, whose credibility is abso-
lutely unquestioned, testified that he received instructions
from *Mr. Jeffris* at numerous times, both verbally and in
writing, to keep an absolutely correct, accurate, and separate
account of the Monico stock, and to the same effect was the
testimony of the tallymen, graders, and shippers. Apparently
all the books, memoranda, letters, accounts, bills, tally cards,
and written matter of every description kept in the defend-
ant's office during the entire transaction were produced in
court and subjected to examination. This written evidence
all tends to show a painstaking effort to follow the instruc-
tions given; nor do we find any tangible evidence impeach-
ing the good faith of the attempt. There was no inherent
difficulty to be anticipated in successfully carrying out these
instructions. It was evidently expected in the beginning that
the Monico logs were to be sawed by themselves without any
intermixture with the defendant's general stock, and if this
were done, and the product piled separately in the yard and
an accurate account kept of each shipment as it went out,
the aggregate amount of the shipments would infallibly rep-
resent the aggregate amount manufactured and sold.

The testimony is plenary and satisfactory to the effect that
the product of that small portion of the siding logs which was
cut in August, 1896 (aggregating somewhere from 50,000 to
100,000 feet), was piled in a separate portion of the yard and
properly marked, except the one carload immediately sold to
the railway company, which was duly accounted for. The
breaking of the boom inclosing the remainder of the siding
logs in the spring of 1897, thus allowing a large portion of
them to become mixed with several million feet of the defend-
ant's logs, made the plan somewhat more difficult of execu-
tion, but in no respect impracticable. The plaintiff's logs

were easily recognizable. They were all cut in the winter of 1895 and 1896, while the defendant's logs were all cut in the following winter, and the difference in their appearance was unmistakable. It appears without question that a strenuous effort was at once made by *Mr. Jeffris* personally and by his employees to mark the plaintiff's logs so that there could be no mistake. *Mr. Jeffris* took a boat and went through the lake marking the plaintiff's logs with a hack of an ax. The logs thus escaping were not reboomed, but it further appears by testimony which cannot be disregarded that, as they came up to the log deck during the spring of 1897, while the defendant's logs were being sawed, the defendant's employees were instructed to run them into a pocket by themselves for future sawing. That a considerable portion of them were thus pocketed and not sawed with the *Jeffris* logs really admits of no question. It is testified to not only by the defendant's employees, but also by Mr. Burton, the agent and employee of the plaintiff who was at the *Jeffris* mill during this period looking after the plaintiff's interests. He testified not only to the marking of the logs in the lake, but also to the fact that during the time the *Jeffris* logs were being sawed in the spring of 1897, "as those logs [*i. e.* the plaintiff's logs] came to the slip they were shoved into the pocket." It is conceded all around that, notwithstanding these efforts, some of the siding logs reached the log deck and were sawed with the *Jeffris* logs; but here again the testimony is positive that, when such a log was cut, the tail sawyer was instructed to mark the lumber from it with an "M," and the employees at the tail of the mill were instructed to place such lumber on a separate buggy and pile it with the Monico stock, and the employees testified that they carried out the instructions fully.

It is also conceded that in the spring of 1897, when the defendant was cutting the last of its logs in the lake, prior to the June to September cutting of the plaintiff's logs, there were days when, on account of adverse wind, the defendant

would be unable to get its own logs to the mill while it was sacking or cleaning the lake, and that on such days the defendant would open the Monico boom and saw some of the plaintiff's logs, rather than allow the mill to stand idle. But it appears that the product was piled with the plaintiff's lumber, and that in the daily record of the sawing which was returned to the office the amount cut from the Monico logs during this period, whether from single stray logs or from a day's consecutive sawing, was attempted to be noted, and that the total amount so recorded during this time was 107,066 feet.

The referee found in his fifth finding that the siding logs scaled at 385,740 feet, and that about 80,000 feet thereof were sawed in 1896, although the defendant claimed the amount to be considerably less. Adding this amount to the amount recorded as cut in 1897 prior to June 25th, a total of 187,066 feet is obtained, which (if credence be given to the ample and apparently truthful evidence of defendant's witnesses) represents the entire amount of the plaintiff's logs cut prior to the June to September cutting of 1897. On this basis there were 198,674 feet of the siding logs which were either surreptitiously cut by the defendant and appropriated to its own use prior to June 25th, or were left in the pocket or boom and cut during the June to September sawing of 1897. The evidence wholly fails in our judgment to sustain the theory of surreptitious cutting and conversion. It is to be remembered that the plaintiff's employee Burton was at the mill looking after the plaintiff's interests during the entire time. All reasonable opportunities seem to have been given him to watch the work and inform himself as to how it was being done. He knew of the breaking of the boom and of the difficulties which that accident brought with it, as well as of the efforts made to keep an accurate account of the cut. Had there been a systematic appropriation of the plaintiff's logs, such as would be necessary to make a total of so large an amount, he must have known it if he was doing his duty, and

he was false to his employer's trust if he did not report it. He was examined at length, and not only does it appear that he made no objection at the time, but the most that he testifies to is that he is satisfied that a good many logs came up to the log deck among the *Jeffris* logs which were unmarked, and which in his judgment were Monico logs, but how many there were he could not say. This may all have been true, indeed it is admitted to have been true, but it does not prove that the lumber cut from them was not properly marked and separated after it was cut and piled with the Monico stock. The evidence to the effect that the Monico lumber which was cut prior to June 25, 1897, did not exceed in all 187,066 feet, and that it was practically all marked as it was cut and piled by itself in properly marked piles, and that it went into the so-called Monico stock, is to our minds very satisfactory and conclusive. It is met by absolutely no direct evidence to the contrary, and it cannot rightly be rejected unless there are other facts satisfactorily proven which are inconsistent with it and in the light of which it cannot be believed. Really the only serious claim that can be made to the contrary is that the total amount of lumber reported as manufactured and sold by the defendant is so disproportionate to the amount which should have been manufactured that it amounts to proof either that the accounts were radically incomplete or that a substantial portion of the logs were sawed and the product mixed and sold with the defendant's own stock, and to this claim attention must be given.

We have already referred to the specific and frequent instructions given by *Mr. Jeffris* to the bookkeeper and other employees with regard to keeping the Monico stock separate and making separate report and record of all sales and shipments, as well as the testimony of the employees that they attempted to carry out such instructions to the letter, and the evidence of such attempt furnished by the books and papers of the defendant which were produced at the trial. No ex-

tended review of this evidence will be attempted. It appears that the parties contemplated that the grading and scaling of the lumber were to be made as it was sold and shipped. At least such was the course pursued, and no claim that it was improper appears to have been made during the entire transaction. The defendant had a large stock of its own lumber in the yard. All sales were made to foreign points, and shipments were entirely by rail. When an order was received, the yard foreman or shipper was furnished with a tally card on which he was required to enter the amount of each kind of lumber in a shipment, the person to whom shipped, and the number of the car. He could make up the shipment from the defendant's lumber or from the Monico lumber, or from both, as seemed best; but all lumber shipped from the Monico stock was to be so marked opposite the item on the tally card. These cards were filled out as the lumber was taken from the piles, and were turned in to the office daily, and formed the basis of the merchandise account. Upon the books also the items sold from the Monico stock were so marked. The yard foreman or shipper was also furnished a book in which he was required to enter the items taken from the Monico stock at the same time that he made the entry on the tally card or immediately afterwards. The two yard foremen who superintended the shipping of practically all of the stock were examined as witnesses and testified fully as to the systematic and correct keeping of the tally cards and books. A very large portion of the tally cards and all of the books were produced at the trial and were subjected to examination, and they gave evidence of a *bona fide* attempt to keep the account accurately and fully. In addition to the books and records named, *Mr. Jeffris* procured a special book in November, 1897, after a few hundred thousand feet of the lumber had been shipped, in which he directed to be kept a separate record of all Monico shipments, with all details as to each shipment. In this book the items already shipped were first en-

tered, and the shipments thereafter made were attempted to be kept. This book covers many pages and was produced at the trial. It corresponds very closely with the record furnished by the tally cards and the books kept by the yard foreman. If *Mr. Jeffris* had been desirous of concealing the amount of the lumber manufactured and shipped from the Monico stock of logs, he pursued a very strange course to accomplish that end. His acts indicate an intention to keep several independent records of the transactions, rather than an intention to keep an imperfect or misleading record.

It is true there were errors found in the various records. Items were found upon the cards which did not appear in the books, and *vice versa;* but this was natural, and in fact almost unavoidable. Indeed, had there been a perfect agreement between all the items found upon all the records, it would indicate either that the books were kept by men of supernatural qualities or that the records had been manufactured for the occasion. The transactions were many hundred in number, and covered over 4,000,000 feet of lumber shipped in small shipments through a space of more than three years. The mistakes and omissions were partly in favor of the defendant and partly in favor of the plaintiff. They were fully gone into upon the trial and their amounts ascertained. The referee found that the errors in the books against the plaintiff amounted to $882.91, and the errors in its favor amounted to $337.91, leaving a net difference which should have been credited to the plaintiff of $525.33. The evident error of $19.67 is the referee's. Considering the number, magnitude, and variety of the transactions recorded, and the fact that some entries had to be made in the yard and some in the office, that the original entries were necessarily made in a hurry and were transcribed to the books by other employees, there is nothing in the result to cast serious discredit upon the records, or to cause them to be rejected as a basis for ascertaining the amount of lumber manufactured and shipped. It

is argued that separate books should have been opened for this stock and that it should have been sold by itself. No suggestion that such a course was necessary or desirable appears to have been made while the business was progressing, nor does the contract require it. The contract requires the lumber product to be piled and kept separate, but goes no further. It was to be sold to the best advantage. Manifestly it might well be that it could be sold to better advantage, especially as it neared the end and became fragmentary, in connection with the sales of the defendant's own stock, than if every order were required to be filled from it alone.

Two computations were made by Mr. Harwick of the amount of Monico stock sold and shipped as appears by the sales book of the defendant, one showing the amount to be 4,022,452 feet and the other (apparently more carefully made) showing it to be 4,052,998 feet. This did not include, however, 39,184 feet of lumber left of the stock in November, 1899, which was then inventoried by the parties and sold to the defendant; nor did it include the net omissions or errors found by the referee in the books against the plaintiff, amounting to $525.33. These omissions must have amounted to nearly or quite 50,000 feet of lumber at the average price obtained. Adding these figures together, we find a total of 4,142,182 feet of lumber manufactured according to the defendant's books, after correcting mistakes, and exclusive of lath and shingles.

It will be interesting and helpful to inquire whether there are any independent facts proven in the case which tend to corroborate this result. It will be remembered that two scalers, Dennis and Tubbs, were employed by the plaintiff to scale the logs which came upon the log deck during the June to September sawing of 1897, and that they made an apparently careful and complete scale of every log which passed over the deck, and that their scales aggregated 3,584,540 feet. If to this actual log scale we add the proper percentage of

overrun and the amount which was cut in 1896 and before June 25, 1897, we should approximate very closely to the amount of lumber which the Monico stock ought to yield. There was considerable testimony as to the proper percentage of overrun, the amounts varying from ten to twenty per cent. Tubbs and Dennis agreed that the overrun on the logs scaled by them should have been ten per cent., and Dennis thought it might have been twelve per cent. If we take ten per cent. as the proper figure and add that to the Dennis and Tubbs log scale, and then add the further sum of 187,066 feet, being the amount of lumber shown to have been cut in 1896 and prior to June 25, 1897, we have the gross amount of 4,130,060 feet as the amount which the logs should produce. If we add twelve per cent. for overrun instead of ten, we have 4,201,680. As matter of fact, it appears from the tally at the tail of the mill that the actual overrun on the logs scaled by Dennis and Tubbs was twelve and six-tenths per cent.

Another comparison may be made reaching similar results. December 6, 1897, the plaintiff sent one Morrill, an expert lumberman, to the mill to scale the lumber then in pile. Burton, another employee of the plaintiff, showed him the piles. Morrill spent two days making the estimate, and opened some piles. He returned his estimate in writing, giving the amount of each dimension of lumber. It was evidently a careful estimate, and it aggregated 3,557,956 feet, of which 870,120 feet were marked No. 4. At the same date Mr. Harwick figured out the amount which appeared to have been sold from the books and found it to be 555,862 feet, making a total of 4,113,818 feet.

These results, which are thus reached by independent processes, are so strongly corroborative of the shipping tally shown by the books, and so positively refute the correctness of the figures adopted by the referee, that we feel compelled to reject the referee's figures both as to the log scale and as to the lumber scale. There is no real basis for the referee's

figures that we can find, except a general idea that the logs ought to have produced more lumber than they did. Burton, indeed, testified that he scaled both the lake logs and the siding logs as they were hauled from the woods in the winter of 1895 and 1896, and that the total scale was 4,800,640 feet; but this is totally at variance with every other fact bearing on the question which was proven in the case, and was evidently so considered by the referee, for he rejected it without even considering it necessary to mention it. We conclude, therefore, that the evidence satisfactorily shows that the total amount of lumber cut from the plaintiff's logs was 4,142,182 feet. In order to determine the log scale in the manner determined by the parties, there must first be deducted from this amount the amount of No. 4 or cull lumber, which according to the tally of the lumber sold was 614,114 feet. We find no tangible testimony to impeach this statement of the amount of the No. 4 and cull lumber, and we therefore accept it. This leaves 3,528,068 feet of No. 3 and better lumber, and, deducting twenty-five per cent. therefrom, we have 2,646,051 feet as the log measure for which $5 per 1,000 is to be paid, instead of 3,274,657, as found by the referee, making a reduction on this item of $3,142.03.

At this point it is proper to notice the findings of the referee as to certain matters in which he finds that the defendant failed to carry out the conditions of the contract. These findings are, in substance: (1) That the books were so imperfectly kept that the amount of No. 3 and better lumber which was manufactured cannot be ascertained; (2) that, by reason of improper trimming and edging, a considerable amount of lumber was graded as No. 4 which would have made No. 3 and better, and hence that the defendant failed to convert the logs into lumber product to the best advantage of all parties concerned; (3) that the defendant failed to perform the work in a workmanlike manner; (4) failed to keep and present vouchers for the expenses of loading the logs, and failed

to keep correct accounts of the receipts and disbursements; (5) failed to make monthly statements and remittances and annual settlements as agreed; (6) failed to keep the products separate, but intermixed them with those of the defendant in shipping; and (7) failed to make a correct tally or scale of the lumber manufactured from the plaintiff's stock. The referee affirmatively finds that it cannot be determined from the evidence what amount of damages was sustained by reason of the improper trimming and edging, and makes no finding as to any damage resulting from the other breaches of contract.

As to some of these defaults little need be said. Defaults which produce no damage are unnecessary to be considered. This principle applies to the failure to keep and present vouchers for expenses and to the failure to make monthly statements and remittances and annual settlements. As to the alleged failure to keep the products separate, we have already held that there was no failure in this regard. The alleged failure to keep correct accounts and a correct tally or scale has also been fully treated and found not to exist. The findings to the effect that the lumber was improperly trimmed and edged and that sound logs were sent to the shingle mill, resulting in an unascertainable loss in No. 3 and better lumber, is yet to be considered. In this connection it may be further stated that the plaintiff also claimed that the logs were too heavily slabbed and not properly piled, as well as that proper diligence was not employed in rescuing deadheads from Trap Lake, but on these claims the referee found in favor of the defendant. The findings of improper manufacture were based principally on the testimony of Burton, the plaintiff's employee, who thought that many wide cull boards ought to have been trimmed into narrower stuff and thus raised in grade to No. 3, and who also thought that too many sound logs were sent to the shingle mill. Some testimony to the same effect was given by Peterson and Wenzlich,

who worked as edgers during a part of the sawing of 1897; and Mr. Morrill, the plaintiff's expert, testified that when he examined the piles he thought that the lumber was poorly trimmed and edged, but otherwise was sawed very good. Kimmel, who was employed as a sawyer part of the time, also testified that some sound logs were sent to the shingle mill.

On the other hand, substantially all of the defendant's employees who had to do in any way with the manufacture of the Monico stock testified positively that it was manufactured, edged, and trimmed in the same manner as was usual in other mills of that character, and in no different way from the way in which they manufactured the defendant's own logs. These men included the mill superintendent, the night foreman, the head sawyer, carriage riders and setters, the yard graders and shippers, and the foreman of the shingle mill, to say nothing of the direct testimony of *Mr. Jeffris* himself. There is nothing apparent to impeach the good faith or credibility of these witnesses. They must have had quite certain knowledge of the facts concerning which they testified, and, furthermore, their testimony is intrinsically probable. Here was a mill running night and day, manufacturing millions of feet of logs, partly belonging to the defendant and partly to the plaintiff, with the same machinery and the same employees. If the plaintiff's stock was improperly cut, it must have been because that was the customary procedure with all the logs which were cut whether belonging to the plaintiff or the defendant, or because the defendant and its employees designedly adopted a different system in cutting the plaintiff's logs from that which they adopted in cutting the defendant's logs. We find no substantial evidence to justify either conclusion, and we are satisfied that the findings of the referee in this regard are against the clear weight of the evidence.

Having found that there was an actual shortage of 441,861 feet in the amount of the lumber reported by the defendant

to have been manufactured and sold, the referee surcharged the lumber account, or, as it is sometimes called, the joint account, with the sum which such shortage of lumber should have realized at the rate of $10 per 1,000, aggregating $4,418.61, and, having allowed this item, he refused to allow to the plaintiff the net balance of the errors found in the books in the lumber account, amounting to the sum of $525.33. The conclusions already reached show that the first-named sum should not have been allowed, as there was in fact no such shortage, but that the latter sum should have been added. This makes the net amount erroneously added to the joint account by the referee on account of sales of lumber $3,893.28.

We now pass to the consideration of the expense account. The contract provided that, after the payment to the plaintiff of $5 per 1,000 for the logs, the defendant should be entitled to retain from the proceeds of lumber sales "the actual cost of removing, hauling, sawing, piling, planing, selling, loading, and disbursements for insurance." In March, 1900, after all the transactions had closed and prior to the commencement of the action, Mr. Jeffris rendered to the plaintiff a summarized statement of the total expenses chargeable to the joint account, the items of which showed the net amount of such expenses to be $24,228.38. In the defendant's answer, verified by Mr. Jeffris in November, 1900, and which has never been amended, the amount of the expenses is set forth at the sum of $24,183.84, but the charges are not itemized. Upon the trial Mr. Jeffris produced a statement of expenses, in which a number of the items in the former statement were materially increased and in which the aggregate claimed was raised to the sum of $28,577.69. About one half of this increase was composed of additional amounts charged for planing-mill work and for loading and selling the lumber. Evidence in support of the increased charges was received without objection. Mr. Jeffris explained these increases by stat-

ing that the charges made in the statement of March, 1900, for the planing-mill work and for loading and selling were simply estimates based on the prices usually charged for such work in handling large stocks, while in preparing the statement presented on the trial he had gone through the books and carefully figured the total sums paid out for such work during the time the transactions were in progress, and pro-rated the expense between the plaintiff's lumber and his own which was handled during the same period, and thus arrived at what he considered to be the actual cost.

The statement of March, 1900, made the following charges for these items:

Planing-mill work...................................... $1,965 90
Loading ..............................................   2,093 34
Selling lumber at fifty cents per thousand..............   2,010 23

The statement produced at the trial put the expense of the planing-mill work and loading together at $5,440.67, an increase on these two items of $1,381.43, and the expense of selling the lumber at seventy cents per 1,000, or $2,815.02, an increase on this item of $804.79. The referee allowed the expense of planing-mill work and loading at $4,059.24 (being the amount claimed in the first statement and practically the amount claimed in the complaint), and allowed the expense of selling at $1,206.45, being at the rate of thirty cents per 1,000, basing the latter finding upon testimony tending to show that a reasonable charge for selling the lumber would be but thirty cents per 1,000. Both of these disallowances are complained of by the defendant.

It is to be remembered that the contract provides for the payment of the "actual cost" of the planing, loading, and selling, and not for the "reasonable" or "customary" charge for such work. Hence the amount of the reasonable value cannot be the standard of the allowance to be made, nor can the evidence of reasonable value or customary charge be of service, unless indeed it is thereby made to appear that the amount

charged as the actual cost is so excessive as to show bad faith or fraud. We do not consider that this latter theory is tenable; hence the effort must be to ascertain, if possible, the actual cost.

It must be said that the evidence of *Mr. Jeffris* in support of his enlarged claim is not in the highest degree satisfactory. It is true he says that the first bill rendered was merely an estimate based upon the figures ordinarily charged for similar work, and that the second bill is the result of tabulation. of the actual expenses, and he gives some more or less persuasive reasons why the cost of loading, planing, and selling this stock was larger than the usual cost of such work; but, after all, it cannot be said that the latter figures represent actual cost. They still have the prorating feature as a necessary element in the ascertainment of the result, and still remain essentially estimates. It cannot be said that the first statement was made hurriedly or unadvisedly. It remained for months as the maximum amount of the defendant's claim. It was incorporated in the answer and verified, not as an estimate or guess, but as the actual expense, and the answer still stands, without change or amendment, with this assertion in it. Under the circumstances, while we cannot agree with the referee that either item can be determined on the basis of reasonable value or customary charge, we think that justice will be best subserved by leaving these charges as they were fixed by the defendant's statement of March, 1900. This conclusion affirms the referee's finding as to the expense of loading and planing, but adds to his allowance for selling the sum of $803.78.

The defendant claimed that there was lost in bad accounts the sum of $915, and so reduced the amount of the gross sales by this sum. The burden was on the defendant to prove that the losses were actually incurred in the prudent conduct of the business. The referee held that the proof did not satisfactorily show losses exceeding the sum of $275.01, which

sum he allowed, and disallowed the balance claimed. We are unable to say that the conclusion of the referee is not justified by the evidence, and we do not deem it necessary to discuss it in detail.

The referee disallowed the following items of the expense account, and such disallowances are assigned as error, viz. :

Sundry items of repairs to machinery and tools, etc., in
  sawmill ................................................ $481 49
Lumber and nails used in building tramway in the yard....   77 31
Part of labor bill for loading logs in 1896................  128 44
Machinery and material used in building loading works at
  Trap Lake in 1897.....................................  214 14
Taxes paid to town of Harrison in 1896...................  680 00

Total .............................................$1,581 38

By an evident error the labor bill for loading logs in 1896 was again disallowed at the sum of $128.11, thus making the aggregate disallowances for these items $1,709.49. These disallowances will be considered in their order.

1. The items under the first head are very numerous. They consist principally of charges for belting, repairs to mill machinery, and new tools or appliances in the mill, or repairs to old tools. The defendant does not refer to any particular items under this head, but makes a general argument that the items should have been allowed. We do not agree with this contention. The defendant was to furnish the mill in which to manufacture the lumber. Repairs to either the mill, the machinery, or the tools cannot justly be considered any part of the expenses contemplated by the contract. They really constitute only a part of the necessary charge for keeping the manufacturing plant available for the defendant's own purposes. They are in the nature of permanent additions to the plant, many of which doubtless served for subsequent use in the defendant's own business. The items under this head are therefore properly disallowed.

2. As to the tramway built in the defendant's yard, it appears that it was built exclusively for convenience in handling the plaintiff's lumber and transporting it from the mill to

the piles, and that it probably was cheaper to build it than to transport the lumber with teams. It also appears that it was used for no other purpose, and was torn down when it had served this purpose. It further appears that the material of which it was composed was shipped to *Mr. Jeffris* at Janesville and was never accounted for in any way; nor is there any evidence as to its value. We think that the net difference between the value of the material used when new and its value when torn down would be a proper expense charge, but it was the duty of the defendant to show what the difference was, or to show that the material was of no value after its use, and, neither fact being shown, we shall not disturb the disallowance of this item.

3. The labor bill for loading the siding logs in 1896 was fully proven at the sum of $359.55, and no good reason appears for rejecting any part of it; hence the disallowance of $128.44 thereof cannot be approved. The duplication of this item, whereby it was disallowed again at the sum of $128.11, makes the entire sum improperly disallowed under this head $256.55.

4. As to the items disallowed for machinery and material used in constructing the loading works at Trap Lake in 1897, practically the same principle applies as to the material used in constructing the tramway. These loading works were found by the referee to have been rented by the defendant to other parties after their use in 1897. The machinery or materials were never accounted for, nor was their value shown, but they appear to have been taken by the defendant and applied to its own use. There is no way of ascertaining what portion of this charge should be allowed, and hence the disallowance will not be disturbed.

5. The disallowance of the item of $680 for taxes paid by the defendant on the logs for the year 1896 may properly be considered in connection with the further disallowance of the subsequent items claimed by the defendant for taxes paid

on the lumber for the years 1897 and 1899, amounting to $368.43 and $40.99 for the respective years named. The charge for the year 1898, amounting to $75.27, was allowed.

It is admitted that no taxes on either logs or lumber were paid by the plaintiff, and that, if the defendant paid taxes which were in fact lawfully levied on either the logs or the lumber during the years named, such payments constitute proper charges against the expense account. Trap Lake, and the Monico siding, where the logs were banked, are in the town of Pelican, and the Jeffris mill and yards in the town of Harrison. No taxes were attempted to be levied on the logs in the town of Pelican. It appears by the evidence that the defendant paid taxes in the town of Harrison upon personal property as follows: In 1896, $893.73; in 1897, $489.47; in 1898, $129.46; in 1899, $79.74. The assessment rolls for these years were read into the evidence so far as they bore on the question. In the assessment roll for 1896, among the personal property assessments appears the name of *D. K. Jeffris Lumber Company,* and among the items of personal property under this heading is the item, "Value of logs, timber, etc., cut within six months prior to April 1st," which is carried out as follows: "Logs at Monico, $6,250; logs at Tomahawk, $500." The total value of personal property is carried out at $8,215 and left at that sum by the board of review. In the roll for 1897, under the assessment against the *D. K. Jeffris Lumber Company,* the log and timber item is carried out with the words "Monico logs," $3,500, and the total valuation of all personal property is carried out at $4,870, and so left by the board of review. In the roll of 1898 there was a single entry under the names *"Wisconsin Sulphite Fibre Company* and *D. K. Jeffris,"* as follows: "Value of merchants' and manufacturers' stock, $800." In the roll of 1899, under an assessment against *D. K. Jeffris* alone, merchants' and manufacturers' stock was carried out at $750, and the value of logs, timber, lumber, etc., at $500.

One Delong, who was the assessor for the town of Harrison during the years 1896 and 1897, was sworn, and testified that he did not assess the Monico logs in 1896; that the words "Logs at Monico" appearing on the roll for that year were not written by him; that his deputy was a Mr. Van Gelder, now deceased, who did most of the work, and the writing on the page in question was Mr. Van Gelder's, but he didn't know whether the words "Logs at Monico" were in Mr. Van Gelder's writing or not; that he didn't know what the board of review did about the matter; that he was not present, but he thought probably the Monico logs were assessed at Harrison; and that there was much talk and trouble about the matter. As to the roll of 1897, he testified that the page in question was in the handwriting of Joe Flynn, who did all his writing, that the entry of "Monico logs" was not in his handwriting, and that he didn't know who wrote it. *Mr. Jeffris* testified, in substance, that the logs were in fact assessed in the town of Harrison in 1896 at the request of Mr. Reese, because they were to be manufactured there. That in the years 1897 and 1899 the assessments made covered the Monico stock as well as his own, and that, after paying the total taxes in the various years, he prorated the same between his own stock and the Monico stock according to the respective amounts of each. Mr. Reese testified that he did not remember of being notified that any taxes had been assessed against the Monico stock at Harrison, but that he knew the logs and lumber were subject to taxation, and he expected *Jeffris* to look after and pay the reasonable taxes. The referee found that no taxes were assessed against the Monico stock in 1896, 1897, and 1899 by the assessor or board of review; that the assessment rolls for 1896 and 1897 had been changed by some person other than the assessor without authority; and that the charges for taxes for the years 1896, 1897, and 1899 should be disallowed.

We are entirely unable to agree with these conclusions.

The assessment rolls of 1896 and 1897 upon their face show that the items of logs assessed against the defendant at $6,250 and $3,500 in those years respectively covered logs at Monico. The evidence which is supposed to show that the items were written in without authority by some stranger or by *Jeffris* himself is entirely inadequate. The books came from proper custody and were evidently fair on their face. The assessor only testifies that he did not make the entries personally, but he does not know whether his deputy made them or whether the board of review made them; and he further testified that the subject was much discussed in 1896, and he thought probably the logs were finally assessed in the town of Harrison. When these facts are taken into consideration, in connection with *Mr. Jeffris's* evidence on the subject, which is not substantially disputed, we can see no ground for rejecting the charges.

The question as to whether the logs or lumber were assessed in the right name is not important. It would be important, perhaps, in an action brought by the town to recover the taxes; but as between the plaintiff and defendant the question is whether as matter of fact the property which was assessed was the Monico stock. If this was the fact, the insertion of the name of the *D. K. Jeffris Company* as the owner affects no rights of the parties as against each other.

The preliminary agreement for the manufacture of this stock for the joint benefit was made March 4, 1896. The logs were thereafter properly assessable in the town of Harrison, where the mill at which they were to be sawed was located. Sec. 1040, Stats. (1898). It is difficult to see why the parties were not in legal effect partners. They had combined their property, labor, and skill in the enterprise for the purpose of joint profit. *Spaulding v. Stubbings,* 86 Wis. 255, 56 N. W. 469. But, whether partners in the strict sense or not, it was a joint enterprise in which both were principals, and if one of the principals paid one of the joint liabilities he

is entitled to credit for his payment upon settlement. We conclude, therefore, that the taxes for the years 1896, 1897, and 1899, amounting in all to $1,089.42, should have been allowed.

It appears that the plaintiff's attorneys procured a type-written copy of the evidence from the official stenographer to enable them to argue the case before the referee and paid $297.46 therefor, which sum was taxed against the defendant in the bill of costs and has entered into the judgment. This allowance is alleged as error. Costs are purely statutory, and in order to entitle an item to allowance the law authorizing it must be pointed out. We are referred to secs. 2921 and 2928, Stats. (1898). Sec. 2921, so far as relevant here, provides only for the recovery of "necessary disbursements." Sec. 2928 provides that when there are charges in a bill of costs "for the attendance of any witnesses, or copies, or ex-emplifications of documents or papers, . . . such charges for copies shall not be taxed without an affidavit that such copies were actually and necessarily used or necessarily obtained for use, . . . nor unless they appear to have been necessary and reasonable in amount." We do not think the words "documents or papers" can reasonably be held to cover a copy of the testimony. These words, in the connection in which they are used, seem quite plainly to refer to such papers or records as must be used upon the trial, or perhaps in preparation therefor. We know of no precedent for the taxation of charges for a copy of the testimony procured by an attorney for his own convenience, and we should hesitate to make such a precedent, for it would manifestly open the way to a serious abuse. We hold that this item was not taxable.

The conclusions reached require that the judgment be reduced in amount as follows: Instead of a balance of $5,709.23 due the plaintiff on the log measure at $5 per 1,000, the correct balance is $2,567.20. The balance on the joint ac-

count is reduced by the following items: Reduction on lumber sold, $3,893.28; additions to the expense account as stated, $803.78, $256.55, and $1,089.42, aggregating in all $6,043.03; and leaving the balance to be divided on the joint account $8,981.84, of which plaintiff's share is $4,490.92, instead of $7,512.43 as found by the referee. These two balances aggregate $7,058.12, to which is to be added the item of $426.52, credits for omissions, which is not attacked, making the total damages $7,484.64 instead of $13,648.18, as allowed by the court, or an aggregate reduction of $6,163.54 in the principal sum of damages. The court allowed interest on the balance of the log account from June 25, 1898, and on the balance of the judgment from October 17, 1900, the date of the commencement of the action. The judgment was entered July 8, 1905, and the aggregate interest allowed on both items was $4,346.74. The proper charge for interest on the reduced sums found due on this appeal for the same periods is $2,477.95, making a reduction of $1,868.79 in the interest charge. The aggregate reduction of principal and interest is thus $8,032.33, to which must be added the item of costs improperly allowed, viz., $297.46, making the total sum by which the judgment must be reduced $8,329.79.

The total amount of the judgment was $18,863.84. It will be modified by reducing the amount thereof to the sum of $10,534.05 as of the date of its entry, and as so modified it will be affirmed, with costs to the appellant.

*By the Court.*—It is so ordered.

Cassoday, C. J., and Timlin, J., took no part.

A motion for a rehearing was denied May 21, 1907.