J.F. AHERN Co., a Wisconsin corporation, and H & H Electric Co., Inc., a Wisconsin corporation, Plaintiffs-Appellants and Cross-Respondents,

v.

WISCONSIN STATE BUILDING COMMISSION and Paul L. Brown, its Secretary and as an individual, and Wisconsin Department of Administration, and Robert H. Dunn, its former secretary and as an individual, Defendants-Respondents and Cross-Appellants.†

Court of Appeals

*No. 81–1274. Argued July 28, 1982.—Decided June 7, 1983.*
(Also reported in 336 N.W.2d 679.)

† Petition to review denied.

72

74

For the plaintiffs-appellants and cross-respondents there were briefs by *Robert J. Kay* and *Mark C. Williamson* and *Geisler & Kay, S.C.* of Madison, and oral argument by *Robert J. Kay* and *Mark C. Williamson.*

For the defendants-respondents and cross-appellants there were briefs by *Bronson C. La Follette,* attorney general, *John C. Murphy,* assistant attorney general, and *Charles A. Bleck,* assistant attorney general, and oral argument by *John C. Murphy,* assistant attorney general.

Before Gartzke, P.J., Dykman, J. and W.L. Jackman, Reserve Judge.[1]

GARTZKE, P.J. J.F. Ahern Co. and H&H Electric Co. brought this action for declaratory judgment, challenging the defendants' actions regarding construction of a state office building in Madison, General Executive Facility II, generally known as "GEF II." The complaint as amended, adds challenges regarding another state office building, GEF III, and six other buildings. The challenges center on the State Building Commission's waiver of the competitive bidding requirements in sec. 16.855, Stats. The defendants are the Building Commission, the Department of Administration, a former DOA secretary, Robert H. Dunn, and Paul L. Brown, director of the Bureau (now Division) of Facilities Management and secretary of the commission.

Plaintiffs claim that the defendants failed to follow state law and that the powers granted to the commission improperly delegate legislative authority to it and violate the constitutional principle of separation of powers. The trial court rejected plaintiffs' contentions and dismissed the complaint. Plaintiffs appealed. The defendants raise several procedural issues in their cross-appeal, which we discuss before reaching the plaintiffs' arguments. We reach plaintiffs' arguments, and because we find they lack merit, we affirm the trial court, except as to the court's failure to dismiss the claims against Brown and Dunn.

We treat the issues raised by the parties in the following order:

---

[1] This case was reassigned from a panel consisting of Gartzke, P.J., Bablitch, J. and Dykman, J. to the present panel at the direction of the Chief Justice of the Wisconsin Supreme Court, pursuant to authority under sec. 751.03, Stats.

1. Did the trial court lack jurisdiction for plaintiffs' failure to serve legislative committees as required by sec. 806.04(11), Stats?

2. Should the trial court have dismissed the claims against Brown and Dunn for plaintiffs' failure to serve notice on the Attorney General as required by sec. 895.45, Stats. 1975?

3. Do plaintiffs have standing?

4. Did the court abuse its discretion by allowing the plaintiffs to amend their complaint a third time?

5. Did the commission and the DOA violate sec. 13.48 (10), Stats. 1977, by entering contracts before final plans were completed?

6. Has legislative power been delegated to the commission with sufficient standards for its exercise?

7. Did the commission comply with sec. 13.48(19), Stats., when waiving the competitive bidding requirements of sec. 16.855, Stats?

8. Is the commission, a legislative committee, unconstitutionally vested with executive branch powers?

9. Are the individual defendants, Dunn and Brown, personally liable for unconstitutional and unlawful expenditure of public funds?

10. Are costs under sec. 814.04(2), Stats. 1979–80, allowable for copies of adverse examinations and a partial hearing transcript?

## GENERAL BACKGROUND

The Building Commission is a legislative committee, created under subch. II of ch. 13, Stats., entitled "Legislative Branch." The commission possesses various powers under sec. 13.48 over the construction and use of state buildings. Those powers include authority to waive the competitive bidding law contained in sec. 16.855, Stats.,

on the letting of state construction contracts. Sec. 13.48 (19).

September 9, 1976 the commission approved the solicitation of "design/build proposals" to construct GEF II. The design/build process utilizes an architect or engineer and a construction contractor to design and construct a building within a maximum allowed cost. The design/build process differs from the conventional procedure by which a building is first designed and contractors then submit bids to construct it, based on the plans, as provided in sec. 16.855, Stats.

The design/build process used in the GEF II project consisted of two phases. In the first phase, interested persons submitted proposals to cover the design and construction of an office building in accordance with a "proposal document" prepared by the Bureau of Facilities Management. The submitted proposals were evaluated by the bureau on the basis of design/build "team" experience and qualifications, the initial building cost and land cost. Based on the number of phase one proposals, two or three of the proposals were to be selected for phase two evaluation. Five design/build proposals were submitted on the GEF II project. December 21, 1976 the commission selected two proposals, those submitted by Marshall Erdman and Associates and by J.H. Findorff and Sons, to proceed to phase two and authorized the release of $80,000 of surplus building trust funds for phase two design and for environmental impact statements. The commission formally waived the competitive bidding requirements of sec. 16.855, Stats., the same day.

Phase two of the GEF II design/build selection process called for the state to enter preliminary design contracts with the two finalists, Findorff and Marshall Erdman. Contracts for the preliminary design services were dated February 8, 1977. The governor signed and approved the contracts March 30, 1977.

Plaintiffs commenced this action December 24, 1976 to enjoin the DOA from entering contracts for the design and construction of GEF II unless awarded by competitive bidding and for a judgment declaring that the commission unlawfully and unconstitutionally exercised its authority.[2] In January 1977 plaintiffs amended the complaint to add a claim for damages against Dunn and Brown.

December 20, 1977 the commission authorized signing the contract for the construction of GEF II by Findorff. February 6, 1978 DOA informed Findorff by letter that the GEF II construction contract was approved and attached a copy of the contract, signed by the DOA secretary, defendant Brown, the governor and Findorff. A contract change order, authorizing the construction of two additional floors of office space, was accepted by Findorff April 12, 1978 and approved by defendant Brown April 24 and by the governor on May 12, 1978.

February 9, 1979 plaintiffs filed a second amended complaint adding a claim that the commission had executed or was seeking to execute other illegal construction contracts by waiving sec. 16.855, Stats., on the GEF III project and six other projects. The trial court permitted the claim as to GEF III. September 20, 1979 the trial court granted plaintiffs leave to file a third amended complaint which incorporated the claims as to the six other projects and added an allegation that sec. 13.48, Stats., violated the separation of powers doctrine of the Wisconsin Constitution.

## PROCEDURAL ISSUES

1. *Notice To Legislative Committees*

The Declaratory Judgments Act requires service of a copy of the petition on the Joint Committee for Review

---

[2] The issue of injunctive relief is not raised on this appeal.

of Administrative Rules if any part of ch. 227, Stats., entitled Administrative Procedure and Review, is placed in issue. Sec. 806.04(11), Stats. It also requires service on the Joint Committee on Legislative Organization if any provision of ch. 13, Stats., entitled Legislative Branch, or ch. 227 (or other chapters) is placed in issue.[3] This requirement was created by sec. 374, ch. 449, Laws of 1977, effective August 1, 1978. Plaintiffs filed their second and third amended complaints after that date, without serving either committee.

Amended complaints supersede prior complaints. *Schweiger v. Loewi & Co., Inc.*, 65 Wis. 2d 56, 58, 221 N.W.2d 882, 884 (1974). Defendants therefore contend that the trial court lacked subject matter jurisdiction because plaintiffs failed to serve either joint committee

---

[3] Section 806.04(11), Stats., provides in relevant part:

If a statute, ordinance or franchise is alleged to be unconstitutional, the attorney general shall also be served with a copy of the proceeding and be entitled to be heard. In any proceeding under this section in which the constitutionality, construction or application of any provision of ch. 227, or of any statute allowing a legislative committee to suspend, or to delay or prevent the adoption of, a rule as defined in s. 227.01(9) is placed in issue by the parties, the joint committee for review of administrative rules shall be served with a copy of the petition and, with the approval of the joint committee on legislative organization, shall be made a party and be entitled to be heard. In any proceeding under this section in which the constitutionality, construction or application of any provision of ch. 13, 20, 111, 227 or 230 or subch. I, III or IV of ch. 16, subch. VIII of ch. 40 or s. 753.075, or of any statute allowing a legislative committee to suspend, or to delay or prevent the adoption of, a rule as defined in s. 227.01(9) is placed in issue by the parties, the joint committee on legislative organization shall be served with a copy of the petition and the joint committee on legislative organization, the senate committee on organization or the assembly committee on organization may intervene as a party to the proceedings and be heard.

with the second and third amended complaints. Failure to comply with the requirement of service on the attorney general in a declaratory judgment action in which a statute or ordinance is alleged to be unconstitutional has been held as fatal to the court's subject matter jurisdiction. *O'Connell v. Bd. of Ed., Jt. Dist. #10*, 82 Wis. 2d 728, 735, 264 N.W.2d 561, 564 (1978).

Even assuming that the requirement of service on the legislative committees is jurisdictional, plaintiffs' failure to serve the amended complaints on the committees did not result in a jurisdictional defect. Generally, a court's jurisdiction over a declaratory judgment action is determined as of the time the suit is filed, and matters occurring after such time are not considered. *Forest Laboratories, Inc. v. Formulations, Inc.*, 299 F. Supp. 202, 212 (E.D. Wis. 1969). The circuit court acquired jurisdiction over the declaratory judgment action under sec. 806.04 (11), Stats. 1975, when the action was commenced. There is no indication that the requirement of service on legislative committees imposed by sec. 374, ch. 449, Laws of 1977, was intended to apply to actions pending when that law became effective.

Because we determine jurisdiction as of the time an action is commenced, it is not necessary that an amended complaint comply with subsequently imposed jurisdictional requirements. The trial court correctly denied defendants' motion to dismiss for failure to serve the legislative committees.

2. *Compliance With Sec. 895.45, Stats. 1975*

Brown and Dunn argue that the complaints should have been dismissed as to them because the plaintiffs failed to give notice to the Attorney General. The amended complaints alleged that Brown and Dunn acted in excess of

their statutory and constitutional authority. The plaintiffs, as taxpayers and on behalf of all taxpayers, propose to hold Brown and Dunn personally liable for unlawful expenditures with regard to GEF II. Notices of the claims against Brown and Dunn were never served on the Attorney General. Section 895.45, Stats. 1975, provides in substance that an action may not be brought against a state employee for an act committed in the course of the employee's duties, unless within ninety days of the event causing the damage giving rise to the action, the claimant serves the Attorney General with notice of a claim stating the time, date, location and circumstances of the event and the names of the persons involved.[4]

If a plaintiff fails to comply with the notice requirement in sec. 895.45(1), Stats. 1975, and the defect is properly raised, the defendant is entitled to dismissal. *Mannino v. Davenport,* 99 Wis. 2d 602, 612, 299 N.W.2d 823, 828 (1981). Accordingly, we conclude that failure to serve the Attorney General with the notice required by sec. 895.45(1), Stats. 1975, requires dismissal of the action as to Brown and Dunn.

---

[4] Section 895.45(1), Stats. 1975, provides:

No civil action or civil proceeding may be brought against any state officer or employe for or on account of any act growing out of or committed in the course of the discharge of such officer's or employe's duties, unless within 90 days of the event causing the injury, damage or death giving rise to such civil action or civil proceeding, the claimant in such action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for such injury, damage or death and the names of persons involved, including the name of the state officer or employe involved.

Section 895.45, Stats. 1975, was amended to provide a notice period of 120 days by sec. 840, ch. 221, Laws of 1979, effective April 30, 1980, and was renumbered sec. 893.82, Stats., by sec. 30, ch. 323, Laws of 1979, effective July 1, 1980.

Even assuming, as the plaintiffs argue, that service of the pleadings on the Attorney General in an action against a state employee provides the notice required by sec. 895.45, Stats. 1975, timely notice was not given. The original complaint served on the Attorney General December 27, 1976 did not assert a claim against Brown or Dunn. The first amended complaint naming Brown and Dunn was served on the Attorney General January 21, 1977. The first GEF II contracts, the preliminary design/build contracts for phase two, were signed February 8, 1977 and approved by the governor on March 30, 1977. The damages, if any, caused by Brown and Dunn could only result from the GEF II design/build contracts and subsequent expenditures. If the first amended complaint purported to be a sec. 895.45, Stats. 1975, notice of claim, it was premature because the contracts had not been executed. The subsequent amended complaints repeated the claims against Brown and Dunn but were filed in 1979, far beyond the ninety-day limit.

We reject plaintiffs' view that a taxpayers' action to recover expenditures by state employees under unconstitutional statutes or in excess of their powers is exempt from the notice requirements of sec. 895.45, Stats. 1975. The exemption is claimed on the theory that a state employee acts as a private citizen under those circumstances, and that the notice provisions do not apply to the acts of private citizens. Section 895.45(1), Stats. 1975, however, requires notice on account of any act "growing out of or committed in the course of the discharge of such . . . employe's duties.' The statutory standard is broader than the "scope of employment test." *Yotvat v. Roth,* 95 Wis. 2d 357, 368, 290 N.W.2d 524, 531 (Ct. App. 1980). The statutory standard encompasses a good faith act performed by a state employee under color of right pursuant

to unconstitutional statutes or in excess of statutory authority.

Plainitffs argue that because Brown and Dunn had notice that their acts may be unconstitutional or in excess of their statutory authority, that they therefore issued GEF II construction contracts at their peril and that their acts consequently fall outside the "growing out of or committed in the course of" standard in sec. 895.45(1), Stats. 1975. We disagree. The statute is for the benefit of the state as well as for the benefit of the state employee. The purpose of the required notice is to give the state an opportunity to investigate claims while they are fresh. *Mannino,* 99 Wis. 2d at 609, 299 N.W.2d at 826. The state needs that opportunity, whether or not its agent acted pursuant to an invalid law or in excess of authority. Plaintiffs' argument would deprive the state of that opportunity.

We reject the contention that waiver or estoppel prevents defendants from asserting noncompliance with sec. 895.45, Stats. 1975. Plaintiffs rely on the delay in asserting noncompliance until long after the ninety-day period had expired, the pleadings were complete, and extensive discovery and trial preparation had occurred. The argument is persuasive, especially in view of the statute's investigative purpose on fresh claims. Failure to give the required notice may be asserted, however, even though it was not raised by the defendants' pleadings. "This rule is in accord with the general view that notice of injury requirements cannot be waived." *Mannino,* 99 Wis. 2d at 612, 299 N.W.2d at 828 (footnote omitted). No basis exists for the equitable doctrine of estoppel. The statute must be enforced even though it produces "harsh consequences." 99 Wis. 2d at 615, 299 N.W.2d at 829.

### 3. *Plaintiffs' Standing*

Wisconsin Construction Employers Council joined the plaintiffs in bringing this action. Defendants argue that the Council lacked standing. Because the Council has been dismissed as a party to this appeal, a determination of its standing will not affect this controversy. The Council's standing is therefore a moot issue. *Milwaukee Police Asso. v. Milwaukee,* 92 Wis. 2d 175, 183, 285 N.W.2d 133, 137 (1979). As a general rule, we will not review moot issues. *Milwaukee Pro. Firefighters Local 215 v. Milwaukee,* 78 Wis. 2d 1, 15, 253 N.W.2d 481, 488 (1977).

Defendants contend that Ahern and H&H lack standing because they have not shown that they, as taxpayers, have suffered an actual loss through defendants' actions, and because they joined this action as merely nominal parties at the Council's request. Ahern and H&H have standing. Wisconsin taxpayers have standing to contest the constitutionality of statutes which result in public expenditures. *Tooley v. O'Connell,* 77 Wis. 2d 422, 438–39, 253 N.W.2d 335, 342 (1977) ; *Thompson v. Kenosha County,* 64 Wis. 2d 673, 679–81, 221 N.W.2d 845, 849–50 (1974). How or why a taxpayer came to be a party is irrelevant to the standing issue.

### 4. *Third Amended Complaint*

Having begun this action in late 1976 and amended the complaint in early 1977, plaintiffs obtained leave for a second amendment in April 1979 and for a third amendment in September 1979. Defendants assert that the trial court abused its discretion by granting leave to file the third amended complaint. That complaint contained new theory : that the grant of authority to the building commission in ch. 13, Stats., offends the constitutional principle of separation of powers.

■

■

A trial court's decision to allow an amendment under sec. 802.09(1), Stats., will not be reversed in the absence of a clear or manifest abuse of discretion. *Wiegel v. Sentry Indemnity Co.*, 94 Wis. 2d 172, 185, 287 N.W.2d 796, 803 (1980). If the record shows that discretion was exercised and a reasonable basis exists for the trial court's ruling, we will sustain it. *Howard v. Duersten*, 81 Wis. 2d 301, 305, 260 N.W.2d 274, 276 (1977).

■

The trial court's decision on the amendment is not part of the appellate record. The burden is on defendants to make it part of the record because they attack the ruling. *Compare Austin v. Ford Motor Co.*, 86 Wis. 2d 628, 638, 273 N.W.2d 233, 237 (1979) (when no transcript furnished, appellate court compelled to accept discretionary conclusion by trial court that there is no evidence to support a jury finding).

We can, however, infer the reason for the ruling from the record before us. When granting defendants' request for a continuance the same day it granted plaintiffs' motion to amend, the trial court noted that defendants had not yet answered the second amended complaint. The court said a hearing could be held within about sixty days and that full preparation was possible within that period. The court's comments entitle us to infer that it believed the defendants were not prejudiced by the amendment. We note in this connection that a constitutional issue had already been raised—the sufficiency of the standards by which legislative authority had been delegated—and no showing has been made that the addition of the separation of powers claim, a purely legal issue, would make preparation more difficult.

■

We conclude that granting leave to plaintiffs to amend their complaint a third time was not an abuse of discretion.

## SUBSTANTIVE ISSUES

5. *Final Plans Requirement*

Plaintiffs contend that the commission violated the "final plans" requirement of sec. 13.48(10), Stats. 1977, by entering design/build contracts. Section 13.48(10), Stats. 1977, provides in material part: "No state board, agency, officer, department, commission or body corporate shall enter into a contract or agreement for the construction, reconstruction, remodeling or addition to any building . . . which involves a cost in excess of $15,000 by any means whatsoever, *without completion of final plans.*"[5] (Emphasis added.)

It is undisputed that the plans submitted by the developers of GEF II and GEF III were unsuitable for sec. 16.855, Stats., competitive bidding when the preliminary and final construction contracts were awarded, and that the contracts exceeded $15,000.

Plaintiffs assert that the reason for the "final plans" requirement is to provide a common standard for the solicitation and comparison of bids, and that the requirement cannot be waived under sec. 13.48(19), Stats. We disagree.

"Final plans" as used in sec. 13.48(10), Stats. 1977, is not defined by statute. The term may be reasonably understood to mean either final architectural plans, as the plaintiffs assert, or to mean final plans consistent with the construction process chosen, as the defendants contend. Because the term may be reasonably understood in two senses, it is ambiguous, *Milwaukee v. Lindner*, 98 Wis. 2d 624, 632, 297 N.W.2d 828, 832 (1980), and we must turn to statutory construction principles to deter-

---

[5] Section 13.48(10), Stats. 1977, was amended to require completion of final plans for all projects involving a cost in excess of $30,000 by sec. 2m, ch. 34, Laws of 1979, effective July 29, 1979.

mine the legislature's intent. *Kollasch v. Adamany,* 104 Wis. 2d 552, 563, 313 N.W.2d 47, 52 (1981).

Section 13.48(10), Stats. 1977, and secs. 13.48(19) and 16.855, Stats., pertain to letting state construction contracts and are interrelated. Statutes relating to the same subject matter must generally be harmonized, if possible. *State v. Burkman,* 96 Wis. 2d 630, 642, 292 N.W.2d 641, 647 (1980). Section 13.48(19) provides in material part:

Whenever the building commission determines that the use of innovative types of design and construction processes will make better use of the resources and technology available in the building industry, the commission may waive any or all of s. 16.855 if such action is in the best interest of the state . . . .

Section 13.48(19), Stats., unambiguously permits the commission to waive sec. 16.855, Stats., in favor of innovative design and construction processes when in the state's best interest. The use of an innovative design and construction process may be in the state's best interest, even though in using such a process final architectural plans do not exist when the final contract is awarded. Because the purpose of sec. 13.48(19) is to free the commission from conventional restraints when acting in the public interest, to read a requirement into the statute which would interfere with implementing that purpose would be unreasonable. The unreasonableness lies in retaining a restrictive requirement arising out of conventional practices, contrary to express authorization to use innovative processes. We must avoid unreasonable readings of the statute. *Burkman,* 96 Wis. 2d at 642, 292 N.W.2d at 647.

Consequently, to harmonize secs. 13.48(10), Stats. 1977, and 13.48(19), Stats., we conclude that the "final

plans" requirement in sec. 13.48(10), Stats. 1977, does not foreclose the commission from awarding a contract based on a process in which final architectural plans have not yet been prepared. Rather, the final plans requirement in sec. 13.48(10), Stats., 1977, is satisfied when the commission has such plans as are sufficiently definite to allow the letting of contracts, consistent with the process chosen for a particular project. Plaintiffs do not contend that the plans were inadequate to award a construction contract under the design/build process.

We reject plaintiffs' remaining arguments regarding final plans. Plaintiffs contend that the trial court erred in excluding Brown's testimony that he understood "final plans" to mean plans suitable for competitive bidding. They argue that Brown's view, as secretary of the commission, should be given great weight as an administrative interpretation of sec. 13.48(10), Stats. 1977. Brown, however, was never asked if he believed "final plans" means final architectural plans in the event of a waiver under sec. 13.48(19), Stats. Plaintiffs also rely on a 1971 Bureau of Facilities Management "Policies and Procedures Manual for Architects/Engineers," for an administrative interpretation of "final plans," which does not, in fact, define the term.

The trial court correctly excluded Brown's testimony and the BFM Manual, as neither established an administrative interpretation of "final plans" in the context presented here.

### 6. *Sufficient Standards For Waiver*

We reject plaintiffs' contention that sec. 13.48(19), Stats., lacks sufficient standards for the commission to suspend a law of general application. Section 13.48(19) permits the commission to waive sec. 16.855, Stats., in favor of innovative design and construction processes if the latter will make better use of the resources and tech-

nology of the building industry, if the waiver is in the best interest of the state, and if waiver is accomplished by formal action.

The commission's authority to waive sec. 16.855, Stats., is partly a delegated legislative power. (The mixed executive and legislative nature of waiver is discussed in part eight.) Whether waiving the bidding requirement is in the state's best interest is a legislative determination. *See In re City of Beloit,* 37 Wis. 2d 637, 644, 155 N.W.2d 633, 636 (1968) (what is "necessary" or "in the best interest" is a legislative determination when political considerations are involved). *Compare Gateway City Transfer Co. v. Public Service Comm.,* 253 Wis. 397, 404–05, 34 N.W.2d 238, 241–42 (1948) (power to grant license as "the public interest may require, upon a finding of public convenience and necessity" is legislative).

That the commission exercises legislative power when deciding whether to waive sec. 16.855, Stats., in a particular instance does not invalidate the delegation. It is too late to argue that legislative power cannot be delegated to administrative agencies. *State v. Lambert,* 68 Wis. 2d 523, 528, 229 N.W.2d 622, 624 (1975) ; *State ex rel. Wis. Inspection Bureau v. Whitman,* 196 Wis. 472, 498–500, 220 N.W. 929, 939 (1928).

No per se rule prohibits the legislature from delegating the power to suspend a law of general application. "The general rule . . . is that if adequate standards for administrative action are established, the validity of the suspending power is similar to that of regulatory power and a grant with an adequate standard is a valid delegation." 1 *Sutherland on Statutory Construction* sec. 4.17 at 110 (1972) (footnote omitted). Whether the commission's power to suspend the bidding requirement in sec. 16.855, Stats., is constitutionally permissible therefore depends on whether its exercise is controlled by adequate standards.

"A delegation of legislative power to a subordinate agency will be upheld if the purpose of the delegating statute is ascertainable and there are procedural safeguards to insure that the board or agency acts within that legislative purpose." *Watchmaking Examining Bd. v. Husar*, 49 Wis. 2d 526, 536, 182 N.W.2d 257, 262 (1971).

The policy statement regarding the purpose of the Building Commission contained in sec. 13.48(1), Stats. 1979–80, sheds light on the "best interest" standard of sec. 13.48(19), Stats. Section 13.48(1), Stats. 1979–80, provides in material part:

The legislature finds and determines that it is necessary to improve the adequacy of the public building facilities that are required by the various state agencies including the educational institutions, for the proper performance of their duties and functions, and that it is in the interest of economy, efficiency and the public welfare that such improvement be accomplished by means of a long-range public building program, with funds to be provided by successive legislatures. . . .

The commission's general purpose under this section, to promote "the interest of economy, efficiency and the public welfare . . . by means of a long-range public building program," applies to determinations whether it is in the state's best interest to waive sec. 16.855, Stats. Under sec. 13.48(19), alternatives to sec. 16.855 must be innovative processes which make better use of the resources and technology of the building industry.

The standards are broad but ascertainable. "[B]road grants of legislative powers will be permitted where there are procedural and judicial safeguards against arbitrary, unreasonable or oppressive conduct of the agency." *State (Dept. of Admin.) v. ILHR Dept.*, 77 Wis. 2d 126, 135, 252 N.W.2d 353, 357 (1977).

While we may not substitute our judgment for that of the commission on a legislative matter, *In re City of Be-*

*loit,* 37 Wis. 2d at 647, 155 N.W.2d at 637, we review legislative-type decisions under the arbitrary and capricious standard. *Daly v. Natural Resources Board,* 60 Wis. 2d 208, 216, 208 N.W.2d 839, 843 (1973) (dictum).

Because there are ascertainable standards for the commission to determine whether waiver is in the best interest of the state, and because judicial review of commission waiver decisions protects against arbitrary, unreasonable or oppressive conduct, sec. 13.48(19), Stats., does not constitute an unlawful delegation of legislative power to the commission.

7. *Compliance With Sec. 13.48(19), Stats.*
A. *Sufficiency Of Record*
Plaintiffs contend that the competitive bidding waivers were invalid because the commission failed to produce a reviewable record showing that it had a sufficient factual basis for its decision. We conclude that sec. 13.48(19), Stats., waiver decisions need not be made on a formal record.

Plaintiffs contend that a formal record is necessary because sec. 13.48(19), Stats., requires "formal action" to waive sec. 16.855, Stats. In our view, "formal action" in this context means a decision memorialized by a resolution. The commission adopted such resolutions.

Plaintiffs assert that "formal action" requires a reviewable record. They rely on *Wis. Environmental Decade v. Pub. Service Comm.,* 79 Wis. 2d 409, 256 N.W.2d 149 (1977), in which the issue was the scope of judicial review of an agency decision whether the Wisconsin Environmental Policy Act, sec. 1.11, Stats., required an environmental impact statement. The *Wis. Environmental Decade v. Pub. Service Comm., supra,* court adopted a standard of review based on the reasonableness and good faith of an agency decision whether an environ-

mental impact study should be conducted. *Environmental Decade v. ILHR Dept.*, 104 Wis. 2d 640, 644, 312 N.W.2d 749, 751 (1981). The necessity of developing a formal reviewable record flows from the imposition of that burdensome standard of review.

The *Wis. Environmental Decade v. Pub. Service Comm.* court gave several reasons for requiring the commission to produce a reviewable record demonstrating that the decision not to require an environmental impact statement was reached upon sufficient preliminary factual inquiry. The court said the decision is "not of the usual variety of administrative determination," being neither legislative nor adjudicative, and occupies a critical position in the Environmental Policy Act. 79 Wis. 2d at 418–19, 256 N.W.2d at 155. The court said that forces within an agency could produce a "bias" against requiring a statement. 79 Wis. 2d at 420, 256 N.W.2d at 155. The court concluded that "[t]hese circumstances distinguish the threshold WEPA determination from the usual administrative determinations" and that for these reasons the circuit court correctly subjected the commission's decision to a "searching inquiry." *Id.*

Whether to waive sec. 16.855, Stats., is not a unique decision requiring a more burdensome standard of judicial review, such as that employed in *Wis. Environmental Decade v. Pub. Service Comm., supra.* We therefore reject the contention that the requirement of formal action requires a formal record supporting the waiver decision.

B. *Contested Case Hearing*

Plaintiffs contend that the commission should have held a "contested case" hearing on the waiver issue because sec. 227.075(1), Stats. 1975 (now sec. 227.064(1), Stats.),[6] provides in relevant part:

---

[6] Section 227.075, Stats. 1975, was renumbered sec. 227.064, Stats., by sec. 716-o, ch. 418, Laws of 1977.

In addition to any other right provided by law, any person filing a written request with an agency for hearing shall have the right to a hearing which shall be treated as a contested case if:

(a) A substantial interest of the person is injured in fact or threatened with injury by agency action or inaction;

(b) There is no evidence of legislative intent that the interest is not to be protected;

(c) The injury to the person requesting a hearing is different in kind or degree from injury to the general public caused by the agency action or inaction; and

(d) There is a dispute of material fact.

In a contested case, the parties may present evidence and rebut or offer countervailing evidence on a record which, generally, may be transcribed and includes a proposed decision stating the reasons and factual basis for it. Secs. 227.07–227.09, Stats. Plaintiffs requested a hearing. They were allowed to appear before and express their views to the commission on waiver of bidding requirements for the GEF II project. The proceeding was not, however, treated as a contested case under ch. 227. The commission made no findings of fact.

■■■

We conclude that because plaintiffs are accorded no "right" to a hearing elsewhere in the statutes concerning waiver of the bidding requirements under sec. 16.855, Stats., sec. 227.075, Stats. 1975, is inapplicable. That entitlement to a contested case hearing under sec. 227.075, Stats. 1975, depends on a right to a hearing elsewhere in the statutes was established in *Town of Two Rivers v. DNR*, 105 Wis. 2d 721, 729, 315 N.W.2d 377, 381 (Ct. App. 1981):

The plain and common meaning of sec. 227.064(1), Stats., then, is that citizens must have a right to some kind of a hearing in the first instance. If they do, then the citizens can request that the hearing be conducted as

a contested case in lieu of, and not in addition to, a different kind of hearing.

Plaintiffs therefore may not rely on sec. 227.075, Stats. 1975, for a right to a contested hearing on the matter.

Plaintiffs contend that their interest in the decision whether to waive competitive bids entitled them to a contested case hearing under *Aqua-Tech v. Como Lake Protect. & Rehab. Dist.*, 71 Wis. 2d 541, 239 N.W.2d 25 (1976), and *Daly, supra. Aqua-Tech* involved a low bidder's standing to challenge a contract awarded by competitive bidding. *Aqua-Tech* has no bearing on whether a sec. 13.48(19), Stats., waiver decision is a contested case under ch. 227, Stats. *Daly* held that members of the Menominee Indian tribe were aggrieved parties under ch. 227 in a DNR proceeding to determine whether to construct a dam because they had an indirect right in the preservation of their hunting and fishing rights.

As noted previously in section six, the waiver decision is partly legislative. A legislative determination may become a contested case. *Ashwaubenon v. State Highway Comm.*, 17 Wis. 2d 120, 127, 115 N.W.2d 498, 502 (1962). Section 227.01(2), Stats., defines a "contested case" as:

[A] proceeding before an agency in which, after hearing required by law, substantial interests of any party to such proceeding are determined or adversely affected by a decision or order in such proceeding and in which the assertion by one party of any such substantial interest is denied or controverted by another party to such proceeding. . . .

For a matter to become a contested case, three elements must appear.

First, there must be a hearing required by law . . . . Second, the legal rights, duties or privileges of one party must have been determined or adversely affected by the proceeding . . . . Third, the assertion of those rights, duties or privileges must have been denied or controverted by another party to the proceeding. . . .

*Daly*, 60 Wis. 2d at 216–17, 208 N.W.2d at 844. A contested case usually involves issues of adjudicative facts. *Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 819 n. 14, 280 N.W.2d 702, 709 (1979).

With respect to a sec. 13.48(19), Stats., waiver decision, no hearing is required by law; no rights, duties or privileges of the plaintiffs have been determined in the waiver proceeding; and no rights, duties or privileges have been denied or controverted by another party.

Whether to waive competitive bids involves generalized questions of policy and discretion rather than factual questions. The waiver decision, by itself, affords no rights, duties or privileges to. any particular party. No "right" to sec. 16.855, Stats., competitive bidding exists. We conclude that the commission's decision to waive competitive bidding does not give rise to a right to a contested hearing under secs. 227.07–227.09, Stats.

C. *Review of Waiver Decisions*

Because a waiver decision does not depend "on any fact found by the agency in a contested case proceeding," sec. 227.20(6), Stats., we do not review the decision under the "substantial evidence" test of sec. 227.20(6). We review legislative-type decisions under the arbitrary and capricious standard.

The arbitrary and capricious standard is described in *Olson v. Rothwell*, 28 Wis. 2d 233, 239, 137 N.W.2d 86, 89 (1965) (citation omitted), as follows:

Arbitrary or capricious action on the part of an administrative agency occurs when it can be said that such action is unreasonable or does not have a rational basis. Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the "winnowing and sifting" process. . . .

Plaintiffs contend that the record does not reflect that the commission reviewed facts which support its conclusion that the use of the design/build process would be in the state's best interest. Plaintiffs contend that the waiver decisions were made on the basis of opinion and speculation within the DOA rather than on facts.

When applying the arbitrary and capricious standard, we determine whether the agency's action had a rational basis, not whether the agency acted on the basis of factual findings. Rational choices can be made in a process which considers opinions and predictions based on experience. Because the waiver decision involved matters of policy and discretion rather than adjudicative fact, the commission was not required to undertake a factual inquiry.[7]

When reviewing a decision under the arbitrary and capricious standard, we may consider all matters before the commission, even though not entered on a formal record. *Westring v. James,* 71 Wis. 2d 462, 475, 238 N.W.2d 695, 702 (1976); *Ashwaubenon,* 17 Wis. 2d at 126–27, 115 N.W.2d at 502. It is unclear whether plaintiffs contend that the commission's waiver decisions were arbitrary and capricious. Our review of the record made before the trial court, however, convinces us that the commission's decisions were not arbitrary or capricious.

Brown's February 1976 memorandum to the commission concerning the UW-Platteville storage/maintenance building, one of the six additional buildings named in the

[7] Plaintiffs argue in their reply brief that to find facts sufficient to support a waiver of sec. 16.855, Stats., the commission should have undertaken competitive bidding to determine whether waiver would save the state money. They contend that it was not enough to estimate comparative costs under competitive bidding and the design/build processes. To force the state to incur the preliminary expenses of competitive bidding in order to waive it is manifestly unreasonable.

third amended complaint, states that the conventional bidding approach would be the most expensive. His September 9, 1976 memo concerning GEF II states that the advantages of design/build included an opportunity for comparisons between design/build and standard competitive bidding, close work by the architect and contractor at an early stage, and fast track construction.

The chief of the Property Planning and Evaluation Section, Bureau of Facilities Management, advised the commission in December 1976 that the design/build prices were almost one-third below estimates based on conventional construction. The estimated project cost based on the average of the five design/build bids submitted in phase one was $1.2 million less than the estimated costs under the sec. 16.855, Stats., competitive bidding. A December 13, 1976 memorandum from Brown to the commission concluded that building GEF II by design/build would save about $2 million over the traditional method.

These memoranda indicate that the design/build method was innovative. The two phase bidding approach allowed the state the option of abandoning the project less expensively than under the conventional system. Brown estimated that the cost after completion of phase II would be $80,000, as opposed to $140,000 for hiring an architect to design the building.

The record before the trial court indicates that the commission could reasonably conclude that waiver of competitive bidding in favor of the design/build process for GEF II was in the interests of "economy, efficiency and the public welfare," consistent with the state's long-range planning goals referred to by the legislature in sec. 13.48 (1), Stats. 1979–80. The commission's decision was based on rational factors and was not arbitrary or capricious.

A January 16, 1976 memorandum from Brown to the commission indicates that the GEF III project arose out

of the same office space crisis which precipitated the GEF II project. The commission waived sec. 16.855, Stats., as to GEF III on July 18, 1977, just seven months after the waiver with respect to GEF II. The proximity in time of the projects provided a rational basis for the commission to rely on the information supporting the GEF II waiver.

Plaintiffs point out that the commission waived sec. 16.855, Stats., a second time with respect to GEF III when a change order was made. Having waived the competitive bidding statute as to the original construction, the commission need not have formally waived it again for a change order. The phase I document contemplated change orders. Under sec. 16.855 competitive bidding, the DOA is authorized to issue contract change orders, "if they are deemed to be in the best interests of the state." Sec. 16.855(7). We see no reason why the same cannot be done in a project built under the design/build process.

Most of the other projects involving the waiver of sec. 16.855, Stats., involved the use of design and construction processes other than design/build. Four of these projects —the Rice Lake driver's license examining station, the DNR Bayfield fish hatchery residences, the Harrington Beach storage/maintenance building and the UW-Platteville storage/maintenance buildings—involved "lump sum" bidding aimed at using prefabricated construction processes. Brown testified on deposition that as to all four of these projects the commission wanted to avoid separate bids for four categories of construction: general construction; plumbing; heating, ventilating and air conditioning; and electrical work, as required by sec. 16.855 (14).[8] Brown testified that the state had experienced significantly higher costs than the private sector in this kind of construction project and that the separate bid requirement of sec. 16.855(14) was a major reason for these costs.

---

[8] Brown's deposition was admitted into evidence as Exhibit 66.

The waiver on the UW-Madison Arlington farms lightweight truss framed house project was, according to Brown, primarily to test a patent process developed by the Forest Products Laboratory. This was a rational motivation for waiving sec. 13.48(19), Stats., under the statutory standards, and was not arbitrary or capricious. The waiver on the Poynette state game farm feedmill was to obtain a better designed product under design/build for the same price than by standard competitive bidding. That waiver was not arbitrary or capricious.

We conclude that the record shows the commission's waiver decisions were reasonable and had a rational basis. Accordingly, the waiver decisions were not arbitrary or capricious.

## 8. *Separation Of Powers*

Plaintiffs contend that the statute creating the Building Commission violates the separation of powers doctrine implied in the Wisconsin Constitution. Plaintiffs assert that the violation consists of vesting a committee controlled by members of the legislature with executive branch powers.[9] The commission consists of three as-

---

[9] The commission's powers under sec. 13.48, Stats., include power: to accept donations, gifts and bequests, sec. 13.48(2)(b)1; to fix rental space for new buildings or additions to existing buildings, to remove departments housed in the state capitol to any building, and to lease space in buildings to other government units or to nonprofit associations organized for public purposes, sec. 13.48(2)(b)2; to employ staff or consultants, sec. 13.48(2)(c); to authorize the advance of moneys from the state building trust fund to the University of Wisconsin for the purpose of purchasing agricultural lands sec. 13.48(2)(d); to allocate funds from the state building trust fund or other available sources to equip University of Wisconsin centers, sec. 13.48(2)(f); and to review assessments on state property, sec. 13.48(2)(g). It may authorize projects involving less than $250,000 with payment out of the state building trust fund. Sec. 13.48(3).

semblymen, three senators, the governor (who serves as chairperson), and a citizen appointee of the governor. Sec. 13.48(2)(a), Stats.

Plaintiffs specifically attack the commission's powers to select sites for public buildings, to administer construction of such buildings and to lease the buildings. Plaintiffs say that those are executive powers, citing *State ex rel. Evjue v. Seyberth,* 9 Wis. 2d 274, 101 N.W. 2d 118 (1960), and *Cutts v. Department of Public Welfare,* 1 Wis. 2d 408, 84 N.W.2d 102 (1957). They assert that those powers involve the execution of law, an executive responsibility, citing *State ex rel. Warren v. Nusbaum,* 59 Wis. 2d 391, 208 N.W.2d 780 (1973), and *State ex rel. La Follette v. Reuter,* 33 Wis. 2d 384, 147 N.W.2d 304 (1967). Plaintiffs contend that the power to waive the competitive bidding requirements of sec. 16.855, Stats., on construction projects also involves execution of the law, a responsibility left to the executive branch of our government.

Plaintiffs' challenge to the facial constitutionality of sec. 13.48, Stats., raises questions of law. We need not defer to the trial court's decision on a question of law. *Engineers & Scientists v. Milwaukee,* 38 Wis. 2d 550, 554, 157 N.W.2d 572, 574 (1968).

All constitutional analysis starts with noting that plaintiffs have the burden of showing beyond a reasonable doubt that the statute is unconstitutional. We must indulge every presumption to sustain constitutionality of a statute. *Wis. Bingo Sup. & Equip. Co. v. Bingo Control Bd.,* 88 Wis. 2d 293, 301, 276 N.W.2d 716, 719 (1979).

---

Under sec. 13.48(10), its prior approval is required for construction contracts for state buildings which involve a cost in excess of $30,000. It may sell or lease land and buildings and may acquire leasehold interests. Secs. 13.48(14) and (15). The commission may authorize certain eminent domain actions, sec. 13.48(16), and also waive sec. 16.855, Stats. Sec. 13.48(19).

Next, it is important to note that the separation of powers doctrine is implied from (rather than expressly stated in) the Wisconsin Constitution. The implication arises from art. IV, sec. 1, art. V, sec. 1 and art. VII, sec. 2 of the Wisconsin Constitution, which vest legislative power in the assembly and senate, executive power in the governor and lieutenant governor, and judicial power in the courts, respectively. *State v. Washington,* 83 Wis. 2d 808, 816, 266 N.W.2d 597, 601 (1978). Accordingly, we do not face the task of applying and possibly construing words used by the authors of our organic law. We deal with a constitutional principle universally recognized in this republic but judicially developed and refined in this state.

Several other state appellate courts have found that legislator-membership on building commissions violates the separation of powers doctrine. In several instances, state courts strictly applied express constitutional separation of powers provisions. *See Murphy v. State,* 212 S.E.2d 839, 841 (Ga. 1975) (construing express separation of powers doctrine, Ga. Const. art. I, sec. 1, par. 23, to prohibit any legislator from performing executive functions); *State v. Bailey,* 150 S.E.2d 449, 452, 456 (W. Va. 1966) (express separation of powers doctrine, W. Va. Const. art. V, strictly enforced to prohibit conferring executive or administrative powers or duties on legislators); *Book v. State Office Building Commission,* 149 N.E.2d 273, 293, 296 (Ind. 1958) (express separation of powers doctrine, Ind. Const. art. III, sec. 1, strictly construed to prohibit conferring executive powers on a commission composed of a majority of legislators). *But see Opinion of the Justices,* 380 A.2d 109, 114–16 (Del. 1977) (transfer of executive functions to administrative agency of general assembly violates implied separation of powers doctrine); *State v. State Office Building Commission,* 345 P.2d 674, 683 (Kan. 1959) (completely legisla-

tive committee performing entirely executive duties violates implied separation of powers doctrine). *See also, People v. Tremaine,* 168 N.E. 817, 822–23 (N.Y. 1929) (incompatibility clause, N.Y. Const. art. III, sec. 7, prohibits legislators from sitting on committees which control spending).

We give little weight to precedents applying express separation of powers provisions. Unlike the constitutions in those states, Wisconsin's constitution contains no express separation of powers provision. The doctrine, as developed by our supreme court, has been liberally applied. To follow jurisdictions which require strict compliance with the doctrine would be to ignore the decisions of this state's supreme court.

It is easy to describe legislative, executive and judicial power in general terms. The legislature itself has provided a textbook description in sec. 15.001(1), Stats., which provides in relevant part:

The legislative branch has the broad objective of determining policies and programs and review of program performance for programs previously authorized, the executive branch carries out the programs and policies and the judicial branch has the responsibility for adjudicating any conflicts which might arise from the interpretation or application of the laws. . . .

In practice, however, to classify a specific action as executive, legislative or judicial is often difficult. The *Washington* court noted:

Although the doctrine of separation of powers is a fundamental principle, it is neither possible nor practicable to categorize all governmental action as exclusively legislative, executive or judicial. The doctrine of separation of powers must be viewed as a general principle to be applied to maintain the balance between the three branches of government, to preserve their respective independence and integrity, and to prevent concentration of unchecked power in the hands of any one branch.

83 Wis. 2d at 825–26, 266 N.W.2d at 605–06 (footnotes omitted).

Because of that difficulty, the established constitutional law in this state is as follows:

The doctrine of separation of powers does not demand a strict, complete, absolute, scientific division of functions between the three branches of government. The separation of powers doctrine states the principle of shared, rather than completely separated powers. The doctrine envisions a government of separated branches sharing certain powers. *State ex rel. Kleczka v. Conta,* 82 Wis. 2d 679, 709–711, n. 3, 264 N.W.2d 539, [552–53] (1978); *Layton School of Art & Design v. WERC,* 82 Wis. 2d 324, 347–48, 262 N.W.2d 218, [229] (1978); *Rules of Court Case,* 204 Wis. 501, 503–4, 236 N.W. 717, [718] (1931); *In re Appointment of Revisor,* 141 Wis. 592, 597, 124 N.W. 670, [671–72] (1910). . . .

*State v. Holmes,* 106 Wis. 2d 31, 43, 315 N.W.2d 703, 709 (1982). Thus, the Wisconsin Constitution, subject to the limitation against "unchecked power," permits a blending or sharing of powers among the three branches of government.[10] *Compare In Matter of E.B.,* 111 Wis. 2d 175, 184, 330 N.W.2d 584, 589 (1983) (within zones of shared power, legislature may not unduly burden or substantially interfere with another branch of government).

---

[10] This sharing or blending of powers by the three branches of government is no new development. In 1787 James Madison defended the new federal constitution against a charge of violating the separation principle by examining the constitutions of several states. He found "not a single instance in which the several departments of power have been kept absolutely separate and distinct." *The Federalist* no. 47 at 248 (M. Beloff ed. 1948). Nor is it a new assumption that the doctrine is intended to prevent unchecked control by one government department over another. In Madison's view, the task is "provide some practical security for each [department], against the invasion of the others. What this security ought to be, is the great problem to be solved." *The Federalist* no. 48 at 252 (M. Beloff ed. 1948).

Compatibly with Wisconsin precedent, *State ex rel. Schneider v. Bennett,* 547 P.2d 786 (Kan. 1976), recognizes that the separation of powers doctrine exists to prevent the danger of "unchecked power" and that a strict application of the doctrine is inappropriate. 547 P.2d at 791. Like Wisconsin, Kansas implies the doctrine from its constitution. 547 P.2d at 792. The *Schneider* court held that legislator membership on an administrative board created by the legislature violates the doctrine only if their service "results in the usurpation of powers of another department by the individual legislators," and that a "court must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented." 547 P.2d at 792 (citations omitted).

The pragmatic approach by the *Schneider* court is consistent with that of our supreme court in *Washington, supra.* The concern is with actual and substantial encroachments by one branch into the province of another, not theoretical divisions of power. A practical sharing or blending of powers is permissible under the Wisconsin separation of powers doctrine. That sharing or blending permits legislators to serve on boards or commissions, unless that service results in a usurpation of powers reserved to another branch. Consequently, sec. 13.48, Stats., violates the constitutional separation doctrine only if it permits the legislature to usurp powers generally regarded as the exclusive province of the executive, and if it does so beyond a reasonable doubt.

We confine our analysis to the power of the Building Commission over the construction of state office buildings, including the power to waive sec. 16.855, Stats., competitive bidding under sec. 13.48(19), Stats. Only those functions of the commission are at issue. As in *Schneider, supra,* our analysis is limited to the "specific

facts and circumstances presented." 547 P.2d at 792. The power of the commission to acquire land or to select building sites is not before us.

Although plaintiffs characterize the commission's powers over construction as "administering" the construction of state buildings, that is not the case. Section 13.48 (10), Stats. 1977,[¹] in substance grants to the commission only the right of prior approval over a contract for the construction of any building which involves a cost in excess of $15,000. No part of sec. 13.48, Stats., authorizes the commission to administer actual construction.

We do not minimize the impact of the commission's right of prior approval over construction contracts under sec. 13.48 (10), Stats. 1977. Because the commission possesses that right, it exercises an immense control over state construction. But it is a right solely to prevent construction not meeting the commission's approval at the contract stage, not a right to administer or supervise the construction itself.

Because that right of prior approval affects the implementation of established law and policy, it is an executive power. The right of prior approval is not limited to the "broad objective of determining policies and programs and review of program performance for programs previously authorized," recognized by sec. 15.001 (1), Stats., as possessed by the legislative branch. The right pertains to the carrying out of those programs and policies, a function of the executive branch, because a specific project, plan or contract cannot become bricks and mortar unless the commission approves the construction contract. *Compare Opinion of the Justices*, 380 A.2d at 112 (approval of

---

[¹] Section 13.48 (10), Stats., as amended by sec. 2m, ch. 34, Laws of 1979, effective July 29, 1979, now requires the commission's prior approval of all construction contracts which involve a cost in excess of $30,000.

architecture and landscaping of new state buildings unquestionably an executive function).

The executive nature of building construction is statutorily recognized by the legislature itself. The Department of Administration, created by sec. 15.10, Stats., is part of the executive branch. That department exercises a wide range of powers and duties over construction work performed by or for the state, as provided in secs. 16.85 and 16.855, Stats., and sec. 16.87, Stats. 1977. Indeed, a contract involving the expenditure of $2,500 or more for construction work is ineffectual for any purpose unless it is indorsed in writing and approved by the secretary or the secretary's designated assistant. Sec. 16.87, Stats. 1977.

Accordingly, it seems to us beyond dispute that construction of public buildings, and therefore the right to grant or withhold approval of a construction contract, is an executive function.

The commission's power to waive the competitive bidding requirement is more difficult to categorize. It is a legislative function because it may be exercised only when waiver is in the best interest of the state. Sec. 13.48 (19), Stats. It is executive because it pertains to construction. It is therefore a mixed or shared power which, we think, is primarily executive because, no matter how exercised, it ultimately pertains to construction, an executive function.

Accordingly, the Building Commission, a legislative committee, apparently controlled by six legislators, shares executive powers with the governor and one voting citizen member appointed by the governor. Sec. 13.48(2)(a), Stats. Although the secretary, head of the engineering function and ranking architect of the Department of Administration are members of the Building Commission and are part of the executive branch, sec. 13.48(2)(a) ex-

pressly makes them "nonvoting advisory members." Assuming, then, that the Building Commission takes action on a majority vote of its members, the legislator members appear to be in a position to exercise executive powers to the exclusion of the executive branch.

The commission's apparent ability to exclude the executive branch from exercise of its own powers does not, however, necessarily violate the separation doctrine in this state. The purpose of the doctrine is "to prevent concentration of unchecked power in the hands of any one branch." *Washington,* 83 Wis. 2d at 826, 266 N.W.2d at 606 (footnote omitted). Accordingly, if the executive branch can check the commission's exercise of executive power, no violation of the separation doctrine exists.

The power of the Building Commission over construction contracts is subject to an absolute check exercisable by the governor through another part of the statutes. Section 16.87, Stats. 1977,[12] provides in relevant part, "Every contract . . . [involving, so far as is material, an expenditure of $2,500 or more for construction work] shall, before it becomes valid or effectual for any purpose, have indorsed thereon in writing the approval thereof of the secretary or a designated assistant, and all such contracts over $15,000 shall also have approval of the governor." Consequently, if the governor chooses not to approve a contract for a state office building, whether because of its design or because it was let without competitive bidding under sec. 16.855, Stats., construction cannot begin.

It is of course true that sec. 13.48(10), Stats. 1977, enables the legislature, through the Building Commission,

---

[12] Section 16.87, Stats. 1977, was amended by secs. 68, 81 and 82, ch. 221, Laws of 1979, effective April 30, 1980, to essentially its present form. Section 16.87(3), Stats., now requires the governor's approval for all contracts in excess of $30,000.

to prevent construction. The legislature, through the commission, will submit only the projects it has approved to the governor for executive approval. The governor, in turn, may prevent the legislature from entering a construction contract which does not satisfy the governor. As a consequence, construction will not occur unless a majority of the legislator members on the commission and the governor agree.

A practical requirement of unanimity between the legislative members of the Building Commission, on the one hand, and the governor, on the other, therefore exists. That compulsory unanimity converts the shared power over building construction into a cooperative venture between the two governmental branches.

The Kansas Supreme Court reached a similar result under similar circumstances. The *Schneider* court held that the powers exercisable by unanimous vote of a council of eight legislators and the governor over an emergency fund gave rise to a constitutionally valid "cooperative effort between the executive department and the legislative department of the state." 547 P.2d at 798. The *Schneider* court said, "Since the action of the finance council must be unanimous, it cannot act without the approval of the governor. We, therefore, hold that the exercise of such power by the state finance council does not constitute a usurpation of executive power by the legislative department." *Id.*

Accordingly, we conclude that sec. 13.48, Stats., has not been shown to violate this state's constitutional doctrine of separation of powers.

### 9. *Dunn and Brown*

Because we decided in part two of this opinion that this action must be dismissed as to Dunn and Brown, their personal liability is a moot issue.

■

10. *Costs*

Defendants contend that the trial court should have allowed as costs their expenses in obtaining copies of plaintiffs' adverse examinations of defendant Brown and of an official in the Department of Administration. They rely on sec. 814.04(2), Stats. 1979–80, which permits costs for "adverse examinations including copies."[13] They contend that the "including copies" language permits recovery of the cost of copies of all adverse examinations, including those not adverse to the party claiming costs.

■

We disagree. To the extent that a statute does not authorize the recovery of specific costs, they are not recoverable. *State v. Foster*, 100 Wis. 2d 103, 106, 301 N.W.2d 192, 194 (1981). Section 814.04(2), Stats. 1979–80, requires that the examination be adverse to the party claiming costs. The examinations of Brown and the official were not adverse as to defendants.

■

Defendants contend that because sec. 814.04(2), Stats. 1979–80, includes "[a]ll the necessary disbursements" as an allowable cost, the trial court should have allowed them to recover the expense of a partial hearing transcript.[14] We would agree with defendants were we at liberty to do so. Copies of transcripts are usually necessary to prepare adequately for trial and certainly for appeal. *Wisconsin S.F. Co. v. D.K. Jeffris L. Co.*, 132 Wis. 1, 36, 111 N.W. 237, 249–50 (1907), held, however, that copies of transcripts are for the convenience of counsel and are

[13] Section 814.04(2), Stats. 1979–80, was amended by sec. 85vq, ch. 317, Laws of 1981, effective July 1, 1982, and now permits recovery of costs for "[a]ll the necessary disbursements and fees

[14] Section 814.04(2), Stats. 1979–80, was amended by sec. 85vq, ch. 317, Laws of 1981, effective July 1, 1982, and now permits recovery of costs for "[a]ll the necessary disbursements and fees allowed by law."

not necessary. We therefore must sustain the trial court's decision to disallow recovery.

*By the Court.*—Order denying Brown and Dunn's motion to dismiss reversed and judgment and orders otherwise affirmed.